IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

| | | |
|---|---|---|
| JONATHAN FELTON, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | CV 124-079 |
| | ) | |
| WARDEN ANDREW MCFARLANE, | ) | |
| | ) | |
| Respondent. | ) | |

_____

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

_____

Petitioner, through counsel, brings the above-captioned petition pursuant to 28 U.S.C. § 2254. Having carefully considered the pleadings and entire evidentiary record, the Court **REPORTS** and **RECOMMENDS** Petitioner's amended § 2254 petition be **DENIED**, this civil action be **CLOSED**, and a final judgment **ENTERED** in favor of Respondent.

**I.    FACTUAL AND PROCEDURAL BACKGROUND**

On April 24, 2014, a jury in the Superior Court of Richmond County found Petitioner guilty of malice murder and two related firearm offenses. (Doc. no. 11-1, p. 2; doc. no. 14, p. 5.) Appointed attorney Ricardo Bravo represented Petitioner at trial and through sentencing. He replaced Hugh Hadden, who withdrew in June 2013 due to a conflict of interest. (Transcript, doc. no. 1-5, pp. 807-08, 812, 814 ("Tr.").)[1] On appeal, the Supreme Court of Georgia summarized the evidence at trial as follows:

_____

[1] For ease of reference, the Court cites to the handwritten page numbers at the bottom right of the exhibits attached to the state habeas transcript, which includes the state criminal trial transcript and other

The evidence viewed in a light most favorable to supporting the jury's verdicts shows . . . On the night of October 25, 2010, police responded to a report of shots fired at a car wash located at 2583 Tobacco Road in Richmond County.  Given the late hour of that Sunday night, the car wash was empty and the surrounding businesses were closed.  The first officer to the scene testified that the victim was unresponsive and lying on his back, bleeding from gunshot wounds.

The victim's girlfriend, who was the only eyewitness to the crime, testified she and the victim had driven to that location in order for the victim to meet someone to purchase an audio component for his car.  She testified that a man was already at the car wash when she and the victim arrived.  A small, four-door red vehicle that had a black woman in the driver's seat was parked nearby.  The girlfriend testified that she waited in the car while the victim got out and spoke with the man.  She stated she could not hear their conversation because the car engine was running, but she could see the two men and the man was faced toward her in front of the victim's vehicle.  The girlfriend testified she saw the man pull out a gun and shoot the victim several times.  She testified the victim raised his arms and tried to back away from the man before collapsing.  Once the victim fell, the man fled from the scene in the red car.  The victim's girlfriend called 911 and described the shooter as a black male wearing a black t-shirt and dark pants with short twists in his hair.  The police put out a bulletin alert for the red car and its occupants and ran database searches based on a partial license plate number, but were not able to make any progress in the case with those leads.

The lead investigator testified that police retrieved the victim's cell phone from the scene and went through the telephone numbers in that phone to cultivate leads, homing in on the phone numbers that appeared close in time to the shooting.  The lead investigator testified that whenever police identified a person of interest from the phone numbers, one of the investigators working the case presented a photographic lineup including that individual's photograph to the victim's girlfriend . . . .

. . . One of the phone numbers that appeared in the victim's cell phone close in time to the shooting belonged to D.J. [Daiquan Johnson].  (original footnote omitted)  Police put D.J.'s picture in a photographic lineup, but the victim's girlfriend did not identify him as the shooter.  However, when police spoke to D.J., he told them his phone had been stolen; therefore, police subpoenaed the records associated with D.J.'s phone . . . . [Petitioner's] phone

---

relevant materials.  (See doc. nos. 1-2, 1-3, 1-4, and 1-5.)  The Court cites to the page numbers at the bottom right of the state habeas transcript, which matches the page numbers listed on CM/ECF.  (Doc. no. 1-2, pp. 1-74.)

number appeared in D.J.'s phone records at approximately the same time D.J. told police his phone had been stolen.  On November 3, 2010, approximately a week after the shooting took place, investigators placed [Petitioner's] photograph in a photographic lineup and presented the lineup to the victim's girlfriend.  She identified [Petitioner] as the shooter, telling investigators she was 100% sure he was the perpetrator.

Felton v. State, 819 S.E.2d 461, 463-64 (Ga. 2018).  The following sections provide a more detailed description of proceedings in the trial court, appellate court, and state habeas court.

### A.     Pretrial Alibi Notices

A primary thrust of the instant habeas petition is that Mr. Bravo failed to submit any evidence at trial of Petitioner's alibi defense because he was completely unaware of it until the second day of trial despite Mr. Hadden filing two alibi notices on the docket prior to his withdrawal as defense counsel.  (See doc. no. 14, pp. 11-25.)  On June 12, 2012, Mr. Hadden filed a notice of alibi defense that identified Amber Brown and Olivia Brown as supporting witnesses and described the alibi as follows:  "The defendant worked at the Wife Saver on Highland Avenue until approximately 10:00.  He then went to his home at 3012 Clinton Road, Augusta, GA, where he stayed until the next morning except for a trip to Walmart on Deans Bridge Road with Amber Brown."  (Tr. 741.)  Mr. Hadden attached handwritten statements from both witnesses.

Ms. Amber Brown's statement provides as follows:

On the night Jonathan is accused, I am willing to write a statement that he was at work and came home after to help take care of our son because he was ill.  I have myself as a witness along with my mother, two sisters and a friend of the family.  He was working at Wife Saver that night and was driving Ms. Jackie's car.  He came home and was helping with the baby.  The main reason I remember this day is because we had to wake up around 12 or 1 am in the morning to get supplies for Quinton (our son).  So in all Jonathan has 1 person (me) who will testify that he was with me that night, my mother and sisters were all at home.  His family friend (Ms. Jackie) whom I will get to write a statement as well.  She is not in Augusta at this moment.  I believe at [Walmart] I paid

3

with my mother's credit/debit card and she is looking up her bank statement at this time. His old job (Wife Saver) says that legal rep has to get clock sheet for that night as well. So I was hearing that you would be able to get that documentation for Jonathan and myself. Thank you very much!! Call if you need any more information.

(Tr. 743.) Ms. Olivia Brown's statement provides as follows:

During this time, Jonathan was working at Wife Saver at Surrey Center. He usually arrived home no later than midnight because he had [a] small child at home and a pregnant fiancé to take care of. Only times that he or my daughter were out after 12 is when they asked me to babysit or if they had to go to the store for something and they took there [sic] children with them. I just don't know when he had time to do the crime he is accused of. On his behalf, this young man has been thru [sic] a lot, but he was working trying to provide for his family and continue his education.

(Tr. 744.) On September 10, 2012, Mr. Hadden filed an amended notice that added Taylor Brown and Miya Brown as additional alibi witnesses. (Tr. 772.)

## B.    Trial

The trial took place from Monday, April 21, 2014, to Thursday, April 24, 2014. (Tr. 75a.) The court reporter did not transcribe opening statements. (Tr. 46.)

### 1.    Testimony of Deputy Kevin Link

As its first witness, the State called Richmond County Sheriff's Deputy Kevin Link. On the night of October 25, 2010, dispatch called Deputy Link to the murder scene at 2583 Tobacco Road. (Tr. 108-10.) Deputy Link was the first responder to arrive shortly before midnight and within minutes of receiving the call. (Tr. 109-10, 116.) He saw Eric Wright, the victim, lying unresponsive on his back near the car wash in front of Dennis's Barbeque. (Tr. 110.) When the ambulance arrived shortly after Deputy Link, EMT personnel discovered a gunshot wound to the chest and could not resuscitate Mr. Wright. (Tr. 111.)

4

Deputy Link interviewed Mr. Wright's girlfriend, Miss Destiney Howard, at the scene. (Tr. 111-12.)  Miss Howard explained she and Mr. Wright arrived at the car wash to meet with "some people" to buy a CD player.  (Tr. 111.)  Mr. Wright and the shooter engaged in a conversation she could not hear, then "all of a sudden the suspect pulled out, what appeared to be, a semiautomatic handgun and immediately began shooting the victim."  (Tr. 112.)  Miss Howard described the shooter as 5'10" to 6' in height with short twists in his hair and wearing a black T-shirt.  (Tr. 112.)  He was in a red vehicle, "possibly a Honda."  (Tr. 112.)  Miss Howard was able to provide a partial vehicle tag number.  (Tr. 112.)  She said a black female was driving the car and there was "another person in the passenger seat, but she couldn't tell if that was a female or a male."  (Tr. 112.)  Deputy Link secured the crime scene and found shell casings but no gun.  (Tr. 113.)  Mr. Wright did not have a gun.  (Tr. 113.)  Investigators arrived and took charge of the crime scene.  (Tr. 114.)

On cross-examination, Deputy Link testified Miss Howard estimated the shooter and Mr. Wright were standing midway between their two cars when the conversation and shooting occurred.  (Tr. 121.)  Miss Howard did not provide a name for the suspect, which led Deputy Link to assume she and Mr. Wright did not know the shooter.  (Tr. 121.)  Deputy Link transported Miss Howard to the station for further questioning by investigators.  (Tr. 122.)

### 2.    Testimony of Destiney Howard

Miss Howard was Eric Wright's girlfriend for five or six months, beginning in March or April of 2010, and she was eighteen years old at the time.  (Tr. 125-26.)  Mr. Wright worked full-time on the day shift at Augusta State University in the chemical plant and also attended Augusta Technical College for training and education in the field of radiology.  (Tr. 126.)  Mr. Wright liked to hang out with Miss Howard at his house because he was a "home person" but

he would accede to Miss Howard's requests to get out of the house for movies and dining at restaurants. (Tr. 126.)

The murder occurred on Sunday, October 25, 2010, and Mr. Wright did not work that day. (Tr. 128.) Mr. Wright owned a black Camaro, and he loved his car. (Tr. 127.) He liked loud music but the sound system in his car was malfunctioning. (Tr. 127.) On that day, Mr. Wright picked up Miss Howard around 5:00 p.m. and they stayed at his house until approximately 11:00 p.m. (Tr. 128.) As they left his house to take her home, Mr. Wright told her they would make a stop at a nearby car wash to meet someone to talk about a part that he wanted to buy for his car's sound system. (Tr. 129.)

While exiting his car at the car wash, Mr. Wright commented to Miss Howard he did not know the person he was meeting there. (Tr. 129.) Mr. Wright stood just in front of his car with his back to Miss Howard, who remained in the passenger seat, and the shooter was standing about two feet away from Mr. Wright and facing Miss Howard. (Tr. 129-33.) Nothing was blocking Miss Howard's view of the shooter. (Tr. 131-32.) She could not hear the conversation because the engine was loud and while Mr. Wright and the shooter did not appear to be arguing or upset, the shooter seemed nervous. (Tr. 133-34.)

About five minutes into the conversation, Miss Howard looked away momentarily, and when she turned back, she saw the shooter pull out a gun and start shooting. (Tr. 134-35.) The shooter was a black male, the gun he used was a revolver, and he fired approximately four shots. (Tr. 135-36.) Mr. Wright put his hands up in a futile attempt to block the shots, and he retreated as the shots were fired until he fell. (Tr. 137.) After Mr. Wright fell, the shooter fired the last shot and ran to a red four-door car with tinted windows driven by a female. (Tr.

6

134-35, 138.)  Mr. Wright was wearing sweatpants and a t-shirt, and he was not armed.  (Tr. 136-37.)

The State entered Miss Howard's 911 call into evidence as State's Exhibit 1.  (Tr. 139.) On the call, Miss Howard described the shooter as a black male wearing dark clothes who had a mustache and little twists in his hair.  (Tr. 140.)  Miss Howard testified that the only people present at the scene when the shooting occurred were Miss Howard, Mr. Wright, the shooter, and the female driver of the red car.  (Tr. 141.)  After the shooting and before police arrived, two unidentified friends of Mr. Wright arrived at the car wash in a white Impala and asked what happened.  (Tr. 141.)

Investigators presented Miss Howard with a total of three lineups, and she did not identify anyone as the shooter until the third lineup, when she identified Petitioner.  (Tr. 141-42.)  Prior to the shooting, she had never seen Petitioner, did not know who he was, and never had any relationship with him.  (Tr. 142.)  When shown a printout of a lineup dated November 3, 2010, with Petitioner's picture circled, Miss Howard confirmed this was the third lineup presented to her and she had circled Petitioner as the shooter.  (Tr. 143-44.)  The State entered this printout into evidence as State's Exhibit 2.  (Tr. 146, 523-24.)  Miss Howard also identified Mr. Felton as the shooter in court.  (Tr. 147.)  Miss Howard identified a picture of Mr. Wright taken before the shooting, and the State entered the picture into evidence as State's Exhibit 3. (Tr. 149, 525-26.)

On cross-examination, Miss Howard testified the car wash lights were not bright, but they were bright enough for her to see.  (Tr. 150.)  Before Mr. Wright and Miss Howard left his house for the car wash, Mr. Wright stepped into another room outside of her presence to speak with his parents.  (Tr. 151-52.)  At the car wash, the shooter's red car was parked

perpendicular to Mr. Wright's car at a close distance. (Tr. 155.) Mr. Wright walked to the hood of his car and stood there, and the shooter approached and stood in front of Mr. Wright. (Tr. 156.) Their conversation lasted no more than five minutes. (Tr. 157.) Even though Mr. Wright said the purpose of the meeting was to purchase car stereo parts, neither the shooter nor Mr. Wright had anything in their hands during the conversation. (Tr. 158.) Miss Howard clarified that the two people who arrived at the car wash after the shooting and before the police were Mr. Wright's friends, one of whom was named Terrence. (Tr. 161-62.)

The shooter "aggressively pulled out a gun" from his pants with his left hand and began to shoot while advancing toward Mr. Wright as he retreated and fell. (Tr. 169-73.) The shooter ran to the red car and left with the female driver. (Tr. 174.) Miss Howard told the police the car was lightly tinted, painted candy apple red, and she was able to provide a partial license plate number. (Tr. 181-83.) When she gave the description of the shooter to the police, she said that he was slim, black, and approximately 5'8" with small dreads and a mustache. (Tr. 188.)

Mr. Bravo asked Miss Howard about a phone call she received about the murder, and the State objected as hearsay. (Tr. 180-81.) The trial court allowed Miss Howard to confirm she received a call but prohibited her from describing what the caller said. (Tr. 181.) Mr. Bravo asked Miss Howard if she had any recollection of the conversation, and the State again raised the hearsay objection. (Tr. 181.) The trial court explained hearsay to the jury, and Mr. Bravo interjected to argue the exception for a present sense impression. (Tr. 181.) The trial court sustained the objection. (Tr. 182.)

### 3.    Exclusion of Petitioner's Alibi Defense

As the second day of trial opened, Mr. Bravo asked for a sidebar and explained Petitioner had just handed him copies of two alibi notices filed by prior defense counsel, and his client's contention was "we should be able to call the witnesses." (Tr. 192-93.) The prosecutor pointed out Mr. Bravo had done nothing to follow up on these notices, did not submit any witness list by the deadline of ten days prior to trial, and never indicated any intention to present an alibi defense. (Tr. 194.) The prosecutor also raised the concern of the alibi witnesses not being sequestered and asked the trial judge to sound for them. (Tr. 193-94.) When the trial judge did so, Ms. Amber Brown answered her name, and the prosecutor commented she had been in the courtroom for the entire trial. (Tr. 193.)

The trial court confirmed Mr. Bravo failed to submit any witness list despite witness lists being due ten days prior to trial. (Tr. 193-94.) The prosecutor argued the prospective alibi witnesses were a surprise. (Tr. 194.) The trial judge ruled the alibi witnesses could not testify. (Tr. 194.) Mr. Bravo continued his plea, explaining as follows:

> For the record, my client presented to me their discovery response for the Defense and an alibi notice defense and that was filed by his previous attorney, Mr. Hugh Hadden [on] September the 10, 2012. And obviously, yes, this is my first knowledge of this. I'm requesting the Court to consider the motion and the ability for me to call these witnesses. I understand that Ms. Amber Renee Brown is one of the – the following are the individuals that are listed on the Defense witness list, and that's Ms. Amber Renee Brown, number two, Ms. Olivia Brown; Mr. Taylor Brown, and Miya Brown. I have not had any opportunity to discuss anything with these individuals and, in the abundance of caution to ensure that my client gets his proper Constitutional rights guaranteed and protected, I would respectfully request Your Honor to accept this late notice. And I know under our judicial procedure rules that we're required to go ahead and let the State know ten days prior to trial if that's going to be a defense that we're going to use affirmatively, and at this point for the record I just want to let the Court know that I have not done that due to the strategy and our tactics.

(Tr. 196-97.)

At Mr. Bravo's mention of strategy and tactics, the trial judge interrupted to counter this portrayal by pointing out the obvious, i.e., Mr. Bravo failed to identify the alibi witnesses earlier because he did not know about them until that very morning.  (Tr. 197.)  Mr. Bravo continued to argue for lenience, ending his plea as follows:  "I just think that, in the interest of justice and in order to get a full complete opportunity to present a case for my client, that it would be in his best interest, the Court's best interest, and the judicial process and the appellate process to go ahead and entertain this motion and respectfully accept it."  (Tr. 198.)

The prosecutor pointed out the case was three years old, Mr. Bravo had served as defense counsel for an entire year, and Mr. Bravo did not submit any witness list whatsoever in advance of trial.  (Tr. 198-99.)  The trial judge denied the defense motion, explaining as follows:

> The Court's going to deny the opportunity to use those witnesses.  The case has been going on three years.  There's been no witness list provided to the State. We're in the second day of trial.  An alibi is a major discovery issue where the State would have an opportunity to be prepared, to investigate those witnesses, to investigate everything behind it, to go out and interview.  So with this late notice, the Court's going to deny that opportunity.

(Tr. 200.)

### 4.    Exclusion of Testimony by Petitioner's Uncle Regarding Phone Call by Person Identifying Herself as Miss Howard

The Court moved onto the issue of whether to allow testimony by Mr. Stefan Felton, Petitioner's uncle, who told the prosecutor and Mr. Bravo on the first day of trial he received a phone call the prior year from a woman identifying herself only as Destiney.  (Tr. 200-01.) She told Mr. Stefan Felton, "she's afraid to come to court and if he will give her some money she would not."  (Tr. 201.)  The trial judge ruled Mr. Stefan Felton could not testify because he had known for a year and not come forward, and he was unable to identify the voice on the

10

phone call as belonging to Miss Destiney Howard because he had never heard her voice before the phone call.  (Tr. 201.)

### 5.      Testimony of Investigator Brandon Beckman

Investigator Beckman was the lead investigator and first arrived on scene at 12:56 a.m. on October 26.  (Tr. 204-05.)  He did not find any weapons at the scene.  (Tr. 206.)  There were no weapons in Mr. Wright's car or on Mr. Wright.  (Tr. 206.)  Miss Howard provided a partial license plate number of 505JP, and she said the getaway car was a smaller vehicle that was either burgundy or maroon.  (Tr. 208-09.)  Investigator Beckman ran a database search based on the partial tag number and color, which yielded a large number of vehicles in the search results but none with that profile.  (Tr. 209.)  He went through the search results line by line, car by car, and it did not lead to anything.  (Tr. 209.)

Investigator Beckman opened Mr. Wright's phone and retrieved phone numbers that had been in contact with Mr. Wright near the time of the murder.  (Tr. 208-09.)  He used a database of cell phone numbers, which contained a photograph of the known holder of each listed cell phone number, to determine whether any of the cell phone numbers belonged to a person who matched the suspect's description.  (Tr. 209-210.)  Based on this effort, Investigator Beckman presented a lineup of six people to Miss Howard that included one unidentified suspect, and Miss Howard did not identify the suspect in the lineup as the shooter. (Tr. 210-11.)  Using this same method, investigators presented her with multiple additional lineups with the same outcome.  (Tr. 211.)

One phone number, 706-294-9635, made contact with Mr. Wright's cell phone approximately ten times within the twenty minutes that preceded the murder in the form of missed calls, received calls, and connected calls.  (Tr. 211-12.)  That phone number belonged

to Daiquan Johnson, and Investigator Beckman contacted Mr. Johnson. (Tr. 212.) When the prosecutor asked what Investigator Beckman learned from Mr. Johnson, Mr. Bravo objected on hearsay grounds. (Tr. 212.) The State argued Investigator Beckman was "the lead investigator on the case[,] and case law says that one law enforcement officer['s] knowledge is commuted to another law enforcement officer." (Tr. 212.) The Court overruled the objection and stated the testimony would be admissible for the limited purpose of showing "that it was communicated." (Tr. 212.) Mr. Bravo argued Investigator Beckman "can't speak to what the accuracy of the information is because that would be hearsay." (Tr. 212-13.) The trial court clarified Investigator Beckman could not speak to the accuracy, "but he can report what the communication was to him." (Tr. 213.)

Investigator Beckman testified an investigator spoke with Mr. Johnson, and Mr. Johnson said he did not have his cell phone in the hours leading up to and including the murder because it was stolen that same night while he was attending the local fair. (Tr. 213.) Another unidentified investigator spoke with Mr. Johnson's mother, who stated Mr. Johnson was at the fair during the time of the murder and returned home after the fair. (Tr. 213.) The investigators placed Mr. Johnson in a photographic lineup, and Miss Howard did not identify him as the shooter. (Tr. 213-14.)

Investigator Beckman subpoenaed the records for Mr. Johnson's phone, which the State entered into evidence as State's Exhibit 64. (Tr. 214, 624-25.) The multiple calls made between Mr. Johnson's cell phone and Mr. Wright's cell phone occurred between 11:13 p.m. and 11:50 p.m. on the night of the murder. (Tr. 215.) Also in the call logs of Mr. Johnson's phone was Petitioner's phone number, 706-825-9630, which was in contact with Mr. Johnson's phone "around the time after the phone was stolen." (Tr. 216.) Investigator Beckman obtained

a photograph of Petitioner, and both he and other investigators concluded he looked just like the suspect Miss Howard described. (Tr. 216-17.) On November 3, 2010, Miss Howard identified Petitioner as the shooter in a six-person lineup by circling his photograph. (Tr. 217-18.) The State entered the lineup into evidence as State's Exhibit 2. (Tr. 219, 523-24.) When asked, Miss Howard stated she was 100% sure he was the shooter. (Tr. 219.) Before she identified Petitioner in this lineup, investigators had presented Miss Howard with approximately four to five lineups in which she did not identify anyone as the shooter. (Tr. 221.) Based on Miss Howard's identification, law enforcement obtained warrants for Petitioner's arrest and arrested him in Philadelphia approximately one year later. (Tr. 222.)

On cross-examination, Investigator Beckman testified that, at the scene, investigators found at least three spent .380 caliber casings between where Mr. Wright fell and his vehicle. (Tr. 236.) Miss Howard described the suspect as a medium to light-skinned black male, short in stature, twists in his hair, about 5'9", approximately 18 to 20 years old, slender build, and wearing a black shirt and dark-colored pants. (Tr. 245.) She described the driver of the car as a black female with short hair. (Tr. 246-47.)

The coroner found a small cellophane bag that tested positive for marijuana in Mr. Wright's clothing. (Tr. 255.) Investigator Beckman did not know the amount of marijuana but believed it was a personal use rather than distribution quantity because it was small enough to fit in Mr. Wright's pocket. (Tr. 255-57.) Mr. Johnson's cell phone number was the focus of the investigation because it contacted Mr. Wright's phone ten times on the night of the murder, and just before the shooting occurred, at 11:13, 11:14, 11:20, 11:26, 11:33, 11:42, 11:47, 11:49, 11:50 and 11:51 p.m. (Tr. 261.) There were other phone calls that day to Mr. Wright's phone from friends, for which he had their names saved in his phone, but these phone

13

calls from friends occurred much earlier in the day and approximately five hours before the murder.  (Tr. 263.)  The investigators placed Mr. Johnson in a lineup, and Miss Howard did not identify him.  (Tr. 266.)  Mr. Johnson knew Mr. Wright but there is no description of their relationship.  (Tr. 268-69.)

### 6.    Testimony of Tracfone Representative Winston Chambers

Mr. Chambers is a subpoena compliance manager with TracFone.  (Tr. 300.)  He testified concerning the origin and authenticity of Mr. Johnson's phone records as contained in State's Exhibit 64.  (Tr. 305, 624-25.)  He explained the meaning of each column in the call logs from left to right as follows:  (1) date; (2) military time; (3) cell number making the call; (4) cell number receiving the call; (5) a number signifying whether the contact is a voice call or text message, with the number one signifying a voice call and the number two representing a text message; (6) a number signifying whether the call is incoming or outgoing with a zero indicating outgoing calls and a one indicated incoming calls; and (7) time duration of the call in seconds.  (Tr. 307-08.)  Review of the call log shows that the only connection between the phones of Petitioner and Mr. Johnson was a single call made at 10:44 on the night of the murder that lasted 105 seconds and was made from Mr. Johnson's cell phone to Petitioner's cell phone.  (Tr. 625.)

### 7.    Testimony of Sergeant James Gordon

Sergeant Gordon is a crime scene investigator with Richmond County.  (Tr. 311.)  The murder occurred at Aqualand Car Wash, 2583 Tobacco Road.  (Tr. 313.)  He arrived at the crime scene about 1:30 a.m.  (Tr. 313.)  The initial callout to the scene occurred at approximately 11:54 p.m.  (Tr. 313.)  Based on the location of the shell casings and parts of Mr. Wright's watch that shattered from a bullet, Sergeant Gordon concluded the shooting

occurred close to Mr. Wright's vehicle.  (Tr. 319.)  The closest shell casing was located about twelve feet from Mr. Wright's vehicle.  (Tr. 332.)  The three .380 cartridge casings found at the scene were shot from a semi-automatic pistol because the casings were ejected.  (Tr. 321.)  There were no videotapes available from any surrounding businesses to shed light on what happened that night.  (Tr. 328-29.)  No fingerprints of Petitioner were found at the scene or on Mr. Wright's vehicle.  (Tr. 345-46.)  The murder weapon was never found.  (Tr. 338.)

### 8.      Testimony of Firearms Examiner Francis Jarvis

Mr. Francis Jarvis, a forensic expert in firearms, examined one bullet and three cartridge casings from the scene and opined that the murder weapon was a Hi-Point .380 caliber pistol.  (Tr. 365-68.)

### 9.      Testimony of Dr. Daniel Brown

Dr. Daniel Brown, a forensic pathologist, testified Mr. Wright suffered five gunshot wounds to the chest, right arm, right hand, and left hand.  (Tr. 374, 390.)  The bullet entering his chest passed through the left ventricle of his heart.  (Tr. 393-94.)

### 10.      Testimony of Sergeant Dan Carrier

Sgt. Carrier testified he created the lineup for Daiquan Johnson by including men who have similar characteristics.  (Tr. 406.)  This lineup is State's Exhibit 65, and Miss Howard did not identify anyone in it as the shooter.  (Tr. 407-08, 626-27.)  On the night of the murder, Sgt. Carrier assisted in an unsuccessful effort to canvass the scene and locate witnesses.  (Tr. 415-17.)  In the following days, Sgt. Carrier took possession of Mr. Wright's cell phone and researched phone numbers that were recent contacts.  (Tr. 418-19.)  On cross examination, Sgt. Carrier testified he received an anonymous phone call providing information about two suspects as well as a semi-automatic .380 handgun, and his investigation of this tip led to the

creation of lineups that did not result in a positive identification by Miss Howard.  (Tr. 420-27; 430.)

### 11.	Petitioner's Election Not to Testify

The State rested after Sgt. Carrier's testimony.  (Tr. 430.)  Mr. Bravo made a brief argument for a directed verdict, which the trial judge denied based on Miss Howard's identification of Petitioner.  (Tr. 431.)  After the trial judge summarized his rights, Petitioner elected not to testify.  (Tr. 431-43.)

### 12.	The Defense's Sole Witness:  Recalling Investigator Beckman

Mr. Bravo recalled Investigator Beckman to the stand as the only defense witness.  Investigator Beckman described the crime scene, recalled Miss Howard's description of the suspect, and described the investigation.  (Tr. 444-52.)  Investigator Beckman largely reiterated facts he already discussed during his first time on the stand but he did add that, two days after the shooting, Miss Howard relayed to Investigator Beckman a tip she received concerning the black female driver of the getaway car "possibly going by the name of Shanika."  (Tr. 451.)  This drew a hearsay objection, which was sustained with the trial judge admonishing Investigator Beckman not to repeat what someone else who is not a witness told him.  (Tr. 451.)  The questioning closed with Investigator Beckman confirming the getaway car was never found, the weapon was never found, and Petitioner is approximately 5'5" or 5'6" while Miss Howard described the shooter as 5'9".  (Tr. 448, 452.)

### 13.	Closing Arguments and Jury Charges

The transcript does not include closing arguments.  (See generally Tr.)  The jury charges as pronounced from the bench appear on pages 469 to 485 of the transcript.

16

### 14.   Jury Question

As previously recounted, Miss Howard testified the shooter drew the firearm aggressively from his pants with his left hand and rapidly fired four shots with his left hand while advancing toward the retreating Mr. Wright.   (Tr. 135-36, 169-73.)   The defense submitted no evidence concerning Petitioner's handedness.   During deliberations, the jury submitted the following question:

> The jury's [sic] requested clarification on which hand was used to draw the weapon.  Would there be a difference in if there was a right-handed shooter versus a left-handed shooter?  The jury heard the evidence the shooter, Felton, pulled the gun and shot with his left hand.  We noticed he, Mr. Felton, writes with his right hand.

(Tr. 489.)   Before the trial judge brought the jury back to answer the question, he granted the prosecutor's request to prohibit Petitioner from writing notes with his right hand in the presence of the jury.   (Tr. 490.)   During this discussion, Mr. Bravo stated to the trial judge "He's right-handed, Your Honor."   (Tr. 490.)   The trial court responded to the jury's question as follows:

> Ladies and gentlemen of the jury, all the evidence is in.  There will be no additional evidence.  I can't comment on the evidence, the lawyers can't comment on the evidence, no one can comment on the evidence.  There are 12 of you.  You must use your common sense, your common wisdom, your common understanding, along with the Court's instructions to reach a verdict in this case.  You may now return to the jury room to continue deliberating.

(Tr. 490-91.)   On April 24, 2014, the jury found Petitioner guilty of malice murder and two related firearm offenses. (Doc. no. 11-1, p. 2; doc. no. 14, p. 5.)

### C.   State Appellate Proceedings

Mr. Kyle Winchester represented Petitioner on the motion for new trial and direct appeal. (Tr. 36.)  Mr. Winchester filed his final version of the motion for new trial in February

17

2017.  (Tr. 869-71; 875-76; 885-86; 898-99; 919-24, 926-30.)  In the motion for new trial, Mr. Winchester raised two enumerations of error:  (1) the trial court violated former O.C.G.A. § 17-8-57 because its comments impermissibly bolstered the testimony of Miss Howard and Investigator Beckman, and (2) the trial court violated O.C.G.A. § 24-8-802 by admitting hearsay testimony from Investigator Beckman about Daquin Johnson's statement that he was at the fair and had his phone stolen.  (Tr. 926-930.)  The trial court denied the motion.  (Tr. 944.)  The order denying the motion for new trial does not appear in the trial record.  (See generally Tr.)

Mr. Winchester appealed to the Supreme Court of Georgia, which affirmed the convictions and sentence in September 2018.  (Tr. 1015-22, Felton v. State, 819 S.E.2d 461 (Ga. 2018).)   The entirety of the appeal consisted of Petitioner challenging seemingly innocuous statements by the trial judge during testimony by Miss Howard and Investigator Beckman.  Felton, 819 S.E.2d at 464-68.  When considering an objection to a question posed by Mr. Bravo to Miss Howard concerning an anonymous phone call she received after the murder, the trial judge remarked that Miss Howard may have received calls of sympathy and grief after the murder and characterized Mr. Bravo's question as a "fishing expedition."  Id. at 464-65.  During Investigator Beckman's testimony, the trial judge asked two questions in attempts to summarize or clarify the testimony, as follows:  (1) "Did I understand you to say that you used the telephone numbers of the individuals who made calls close in time and used them in parts of the lineup?"; and (2) "Would it be fair to say that you had a number of anonymous calls and you followed the lead?"  Id. at 465-66.

Petitioner contended on appeal the remarks violated former O.C.G.A. § 17-8-57 by improperly bolstering the witnesses' credibility.  Id. at 464.  As the Georgia Supreme Court

18

explained when rejecting this argument, this former code section "prohibited a judge, who was adjudicating a criminal case, from expressing or intimating to the jury his or her opinion as to whether facts had been proved or as to the guilt or innocence of a defendant." Id. at 466 (citing O.C.G.A. § 17-8-57 (1985)). The Georgia Supreme Court pointed out that the comments about the anonymous phone calls "arose during colloquies with counsel and within the context of the trial court's ruling on an evidentiary objection." Id. at 467-68. Likewise, the Georgia Supreme Court determined the questions to Investigator Beckman were entirely appropriate because they merely sought clarification. Id. Furthermore, the Court concluded none of the comments at issue concerned "the credibility of either witness and so the appellant's assertion of improper bolstering is without merit." Id. at 467. The Georgia Supreme Court also found no prejudice because it is unlikely the trial judge's remarks on such ancillary issues affected the outcome. Id. at 467-68. Petitioner filed a *pro se* motion for reconsideration, which the court denied in October 2018. (Doc. no. 14, p. 6.)

### D.     State Habeas Proceeding

In its final version, the amended state habeas petition filed by attorney Sanford A. Wallack raised the following grounds:

I.     Petitioner received ineffective assistance of appellate counsel in violation of his Sixth and Fourteenth Amendment rights because on appeal, counsel failed to raise that:

   A.     Trial counsel was ineffective for failing to prepare for trial;

   B.     Trial counsel was ineffective for failing to advocate for Petitioner's cause and render the trial a reliable and adversarial process; and

   C.     The trial court erred in permitting hearsay over objection, excluding testimony impeaching the state's main witness,

19

Destiney Howard, and prohibiting Petitioner from asserting an alibi defense.

(Doc. no. 11-4.)  The amended state habeas petition further states, "These stated deficiencies by appellate counsel prejudiced the outcome of Petitioner's appeal."  (Id.)

In a post-hearing brief, Mr. Wallack specified Mr. Winchester was ineffective for not raising Mr. Bravo's failure to: (1) prepare and present an alibi defense, (2) prepare for trial generally, (3) present exculpatory evidence about Petitioner being right-handed, (4) file a pretrial motion concerning an anonymous call an officer received, and (5) stipulate to undisputed evidence.  (Id. at 4-11.)  Mr. Wallack argued Mr. Winchester was ineffective for not arguing the trial court erred by: (1) admitting hearsay and double hearsay concerning Investigator Beckman's testimony about Mr. Johnson's statements, (2) excluding impeachment evidence concerning a call Miss Howard purportedly made to Petitioner's relative, Mr. Stefan Felton, and (3) disallowing Petitioner's alibi defense.  (See doc. no. 11-5, pp. 11-17.)  The post-hearing brief also contended that the cumulative effect of Mr. Winchester's errors prejudiced Petitioner.  (Id. at 19, 26.)

On December 3, 2021, the Superior Court of Telfair County conducted a hearing on the habeas petition and heard testimony from attorneys Bravo and Winchester, girlfriend Amber Brown, and Petitioner.  (Tr. 3-74.)

### 1.    Testimony of Ricardo Bravo

Mr. Bravo graduated from the Catholic University of America School of Law in 1978 and was admitted to the Georgia Bar in 1993, when he began working as a conflict public defender.  (Tr. 31, 33.)  Mr. Bravo testified he met with Petitioner multiple times before trial but could not state the number of meetings with any precision because his office misplaced the

file. (Tr. 7.) When asked to describe his work on the case outside of trial, Mr. Bravo testified he filed pretrial discovery motions and motions in limine and a post-trial motion for new trial. (Tr. 8.) In reality, however, he filed no pretrial motions, and Mr. Winchester filed the motion for new trial. (Tr. 8-9.) Mr. Bravo recalled that, in his discussions with Petitioner, they landed on a defense of mistaken identity, an incomplete investigation by the State, and the lack of evidence linking Petitioner to the crime. (Tr. 9-10; doc. no. 1-6, p. 8.)

Mr. Bravo testified it was his normal practice to review all pleadings filed by prior counsel when taking over a case, but he was entirely unaware of the alibi defense until the second day of trial despite Mr. Hadden filing two alibi notices on the docket. (Tr. 13, 15, 19.) It is Mr. Bravo's belief he could not have relied on these alibi notices filed by prior counsel and, instead, would have had to file his own notices to proceed with the defense at trial. (Tr. 15.) He and Mr. Hadden had one discussion that consisted of Mr. Hadden saying he would send over the discovery. (Tr. 14.) When Mr. Bravo was presented with a transcript of his plea to the trial judge to allow the alibi defense, Mr. Bravo reaffirmed his statement to the trial judge that he chose not to pursue an alibi defense based on "strategy and tactics," but he did not describe the details of any such strategy or tactic. (Tr. 16-17.) Mr. Bravo testified he first heard about the alibi witnesses during trial even though his standard pretrial practice was to discuss with a defendant whether anyone could corroborate his whereabouts at the time of the crime. (Tr. 18.) Mr. Bravo also testified he spoke with Petitioner about the alibi defense prior to trial, but this testimony is filled with equivocations and references to his standard trial "practice and procedure," rather than a specific recollection of having spoken with Petitioner. (Tr. 18-21.)

21

Mr. Bravo did not recall whether he ever spoke with any of the four alibi witnesses. (Tr. 20.) If he spoke with them, it would have been during the trial itself because that is when he first became aware of the alibi defense. (Tr. 20-21.) In response to a question that described the alibi defense as Petitioner working at a restaurant, going straight home, and leaving briefly to buy medicine at Walmart, Mr. Bravo answered he did not make any investigatory effort to verify employment at the restaurant or the transaction at Walmart. (Tr. 21.)

Mr. Bravo "absolutely remembers" speaking with Petitioner about whether he was right or left-handed prior to trial. (Tr. 24.) Mr. Bravo does not know why he failed to call any witnesses to talk about Petitioner's handedness and why he never bothered to mention during closing arguments that Miss Howard testified the shooter was left-handed and Petitioner is right-handed. (Tr. 25-26.)

On cross-examination, Mr. Bravo testified that Petitioner said he had a receipt from the purchase at Walmart but, for reasons not explained by Mr. Bravo, he never received those receipts or attempted to offer them into evidence. (Tr. 34-35.)

### 2.    Testimony of Matthew Winchester

Mr. Winchester graduated from law school in 2014, served as a term clerk for a federal district judge, and started a criminal defense practice focusing on appeals. (Tr. 44-45.) He represented Petitioner in connection with the motion for new trial and direct appeal to the Supreme Court of Georgia. (Tr. 36.)

When asked why he did not raise the claim that Mr. Bravo failed to raise the alibi defense, Mr. Winchester admitted he failed to investigate the issue and should have done so. (Tr. 41, 47.) Disagreeing with Mr. Bravo, he opined that the timely-filed alibi notices by Mr. Hadden should have been sufficient for Mr. Bravo to proceed with the defense at trial. (Tr.

22

41.)  When asked why he did not raise the claim that Mr. Bravo failed to present evidence of Petitioner being right-handed, Mr. Winchester responded as follows:  "If the jury acknowledged that it saw that [Petitioner] was not left-handed, then I don't know what calling a witness could tell them that they already knew would have done differently. . . . I don't know how . . . the omission of that fact would be prejudicial."  (Tr. 43.)

### 3.    Testimony of Amber Brown

At the time of the murder, Amber Brown was Petitioner's girlfriend and they lived together in a home located at 3012 Clinton Road in Augusta with (1) their two children, Quinton and Johnny, (2) her mother, Olivia Brown; and (3) her three sisters, Olivia, Kaila, and Miya.  (Tr. 51-52.)  Ms. Brown verified she signed the statement attached to the original alibi notice and it is factually accurate.  (Tr. 53.)  Furthermore, she verified that, on the night of the murder, Petitioner worked at the Wife Saver restaurant on Highland Avenue until 10:00 p.m., came straight home, and stayed there until the next morning except for a trip with her to Walmart on Deans Bridge Road.  (Tr. 53-54.)  They took the trip to Walmart because their son was sick and needed Tylenol to break a fever.  (Tr. 54.)  Her mother "sent them" to buy the Tylenol and they drove her mother's car, which was a big white SUV for which Ms. Brown could not recall the make or model.  (Tr. 55.)  When asked whether she or Petitioner owned a vehicle at this time, Ms. Brown mentioned she owned a Ford Focus at some point in time but could not recall exactly when and said, "I think we just had my mom's car."  (Tr. 55.) Petitioner accompanied her to Walmart because she did not like going out so late at night by herself.  (Tr. 55.)  Petitioner was not at the address of the murder on the night in question because he was with Ms. Brown.  (Tr. 55-56.)

23

Ms. Brown testified she spoke with Mr. Bravo about the alibi defense before trial. (Tr. 57.) When asked whether Petitioner is right-handed or left-handed, Ms. Brown replied, "[h]e's right-handed, he can't do anything with his left." (Tr. 57.) She had known him for more than ten years and had seen him write, eat, and dress. (Tr. 57.) She discussed Petitioner's right-handedness with Mr. Bravo, but only after the jury posed the question about handedness to the trial judge. (Tr. 58.)

On cross-examination, Ms. Brown could not recall when she lost the Ford Focus in repossession, and she could not recall the year model, the color, or whether it was a hatchback or sedan. (Tr. 59.) She purchased the Tylenol at Walmart on the night of the murder with her mother's debit or credit card. (Tr. 59.) When asked whether she saved bank statements showing use of the card to make this purchase, Ms. Brown explained she saved a screenshot of the charge to her phone but no longer had the screenshot because of the passage of time between the trial and state habeas hearing, and because she had replaced her phone multiple times. (Tr. 59-60.) She stated she told Mr. Bravo about the screenshot. (Tr. 60.)

### 4.    Testimony of Petitioner

Mr. Bravo visited Petitioner two to three times at the jail to prepare for trial, and this was the extent of their conversations, with no conversations occurring by phone. (Tr. 62.) The first meeting was merely an introduction that occurred about one year before the trial and lasted ten to fifteen minutes. (Tr. 63.) The second meeting lasted about the same length of time but was more substantive. (Tr. 64.) The third meeting occurred at the courthouse before a hearing, lasted about five minutes, and consisted of Mr. Bravo describing their case as being about self-defense. (Tr. 65.) This confused Petitioner, but he just listened and did not attempt to correct Mr. Bravo or mention the alibi defense. (Tr. 66.) Petitioner knew about the alibi notices filed

24

by Mr. Hadden, and he assumed the two attorneys were "on the same page" so he "never really had the opportunity to discuss with Mr. Bravo about the situation." (Tr. 66.)

They did not meet alone again until the evening of the second day of trial, when Mr. Bravo mentioned the prospect of pleading guilty, which Petitioner refused to consider. (Tr. 67.) When Petitioner made it clear he would not change his plea to guilty, they began discussing potential witnesses for the first time ever. (Tr. 67.) When Petitioner realized Mr. Bravo did not plan to call any defense witnesses, he asked Mr. Bravo why he was not going to call his alibi witnesses. (Tr. 68-69.) His question prompted Mr. Bravo's request that the trial judge allow the alibi witnesses to testify despite Mr. Bravo's failure to submit a witness list by the deadline of ten days prior to trial. (Tr. 70; 192-94.) Mr. Hadden spoke with the alibi witnesses but to Petitioner's knowledge Mr. Bravo never did. (Tr. 70.) If the alibi witnesses had testified at trial, Petitioner likely would have elected to testify himself "to prove where [he] was at the time of the murder." (Tr. 71.)

Petitioner is right-handed, and Mr. Bravo never discussed handedness with him. (Tr. 71.) During closing arguments, Mr. Bravo never mentioned that Petitioner is right-handed. (Tr. 71.) Mr. Bravo never discussed pretrial motions with Petitioner or any effort to exclude any evidence. (Tr. 72.)

### 5.    State Habeas Court's Decision

The state habeas court entered a final order denying the amended petition on November 28, 2022, finding Mr. Winchester did not render ineffective assistance in his selection of issues to pursue on appeal and Petitioner failed to demonstrate any error prejudiced the outcome of the appeal. (Doc. no. 1-6, pp. 5-11.) The state habeas court found Mr. Bravo's representation was neither deficient nor prejudicial. (See id.)

With respect to the alibi defense, the state habeas court found Mr. Bravo was not ineffective because (1) he met with Petitioner in advance of trial and inquired about a potential alibi defense, and Petitioner failed to identify any alibi evidence or witnesses until the second day of trial; and (2) "[w]ithout access to the information prior to trial and the ability to fully investigate the potential alibi, trial counsel was not ineffective for failing to timely pursue the defense."  (Id. at 7-8.)  The state habeas court found there was no prejudice caused by Mr. Bravo's failure to present the alibi defense for two reasons.  (Id. at 7-9.)  First, Ms. Brown's testimony could have been harmful by providing a basis for the jury to find she was the driver of the getaway car because (1) Miss Howard testified a black female drove a small red Honda as the getaway car; (2) Ms. Brown's testimony places her and Petitioner on an errand outside of their home near the time of the murder; and (3) Ms. Brown admitted she owned a Ford Focus but could not recall the color or whether it was repossessed before the murder.  (Id. at 8-9.)

Second, the state habeas court characterized Ms. Brown as an unreliable witness because (1) there is no corroborating evidence such as proof of the Walmart transaction or testimony from other alibi witnesses; (2) she is biased because of her relationship with Petitioner and potential involvement in the shooting; and (3) she was unable to recall basic details such as the color of her Ford Focus.  (Id. at 9 & n.4.)  "By contrast," Miss Howard had a clear vantage point from mere feet away, she identified Petitioner as the shooter in a lineup after declining to identify anyone in prior lineups, and investigators "linked Petitioner to the victim through cell-phone records which provided the basis for the inclusion in the photographic line-up."  (Id. at 9 n.5.)

26

The state habeas court found Mr. Winchester was not ineffective for failing to raise the alibi issue on appeal because (1) "appellate counsel would have had to overcome trial counsel's representation that Petitioner did not inform him of the alibi which is not supported by the record or trial counsel's testimony"; and (2) "statements by trial counsel indicated that the decision not to pursue the alibi at trial was strategic," and the decision not to challenge this strategic decision on appeal was a reasonable, strategic decision.  (Id. at 7, 9.)

With respect to the claim Messrs. Bravo and Winchester were ineffective for not raising the issue of Petitioner being right-handed, the state habeas court denied relief on this ground generally by (1) noting Petitioner argued "several other aspects of ineffective assistance of trial counsel that were not raised on appeal;" (2) finding as to these "other aspects" that Mr. Bravo presented a meaningful and constitutionally adequate defense at trial and Petitioner was not prejudiced by Mr. Bravo's representation.  (Id. at 10.)

Petitioner filed a notice of appeal on December 27, 2022, and filed a Certificate of Probable Cause ("CPC") with the Georgia Supreme Court on December 28, 2022.  (Doc. no. 11-8.)   The Georgia Supreme Court denied the CPC without comment, (doc. no. 11-9, S23H0474, Felton v. White (Ga. Sept. 6, 2023)), and the remittitur issued on September 28, 2023, (doc. no. 11-10).

### E.      The Instant § 2254 Proceeding

Petitioner's amended petition asserts the following grounds for relief:

I.      Petitioner was denied effective assistance of counsel at his motion for new trial and direct appeal proceedings in violation of the Sixth and Fourteenth Amendments because:

     A.      Appellate counsel failed to raise ineffective assistance of trial counsel for failure to investigate and present an alibi defense;

B.   Appellate counsel failed to argue that the trial court erred by denying Petitioner his right to make his defense, specifically by excluding Petitioner's alibi witnesses during trial;

C.   Appellate counsel failed to argue that the trial court erred by admitting hearsay and double hearsay at trial;

D.   Appellate counsel failed to challenge the trial court's improper exclusion of testimony related to the credibility, motive, and/or bias of the State's eyewitness Destiney Howard;

E.   Appellate counsel failed to argue that trial counsel was ineffective in failing to present exculpatory evidence, specifically evidence that Petitioner is right-handed but the shooter used his left hand; and

F.   Appellate counsel's ineffectiveness individually and cumulatively prejudiced Petitioner.

(Doc. no. 14.)  Respondent asserts Petitioner procedurally defaulted Ground I(D) by failing to raise it in his state habeas petition, and the state habeas court's decision on all remaining grounds warrants deference as consistent with and a reasonable application of Strickland. (Doc. no. 10, pp. 12-30; doc. no. 16, pp. 7-8.)

## II.    GENERAL STANDARD OF REVIEW

Under § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim

(1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28

The United States Supreme Court has characterized § 2254(d) as "part of the basic structure of federal habeas jurisdiction, designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions." Harrington v. Richter, 562 U.S. 86, 103 (2011). Accordingly, § 2254(d) creates a "difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (citations omitted).

In Brown v. Payton, 544 U.S. 133, 141 (2005), the Supreme Court explained the difference between the "contrary to" and "unreasonable application" clauses in § 2254(d)(1) as follows:

> A state-court decision is contrary to this Court's clearly established precedents if it applies a rule that contradicts the governing law set forth in our cases, or if it confronts a set of facts that is materially indistinguishable from a decision of this Court but reaches a different result. A state-court decision involves an unreasonable application of this Court's clearly established precedents if the state court applies this Court's precedents to the facts in an objectively unreasonable manner.

Id. (internal citations omitted). Thus, under § 2254(d)(1), it is not enough to demonstrate that a state court's decision is wrong; "even clear error will not suffice." White v. Woodall, 572 U.S. 415, 134 S. Ct. 1697, 1702 (2014). Rather, the habeas petition must show the state court decision was "objectively unreasonable." Wiggins v. Smith, 539 U.S. 510, 520-21 (2003); see also Woods v. Donald, 575 U.S. 312, 316 (2015) (a petitioner must show the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement."). A showing that the state court's determination was unreasonable is a substantially higher threshold than whether it was correct. Reed v. Sec'y, Fla. Dep't of Corr., 767 F.3d 1252, 1260-61 (11th Cir. 2014); Evans v. Sec'y, Dep't of Corr., 703 F.3d 1316, 1325 (11th Cir. 2013). In

addition, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen, 563 U.S. at 181.

Moreover, under AEDPA's highly deferential standard of review for state court factual determinations, a federal habeas court may only grant relief if a state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Additionally, § 2254(e)(1) requires the Court "to presume the correctness of state courts' factual findings" unless the habeas petitioner rebuts that presumption "with clear and convincing evidence." Nejad v. Att'y Gen., State of Ga., 830 F.3d 1280, 1289 (11th Cir. 2016) (citing Schriro v. Landrigan, 550 U.S. 465, 473-74 (2007)); see also Reese v. Sec'y, Fla. Dep't of Corr., 675 F.3d 1277, 1287 (11th Cir. 2012) ("In a habeas proceeding, our review of findings of fact by the state court is even more deferential than under a clearly erroneous standard of review."). "The Supreme Court has not yet defined § 2254(d)(2)'s precise relationship to § 2254(e)(1). . . . Whatever that precise relationship may be, a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Tharpe v. Warden, 834 F.3d 1323, 1336 (11th Cir. 2016) (citing Wood v. Allen, 558 U.S. 290, 301 (2010)).

### A.    Analyzing Ineffective Assistance Claims

Ineffective assistance of counsel claims are subject to the two-part test enunciated in Strickland v. Washington, 466 U.S. 668 (1984), and the test applies to claims of ineffective assistance of both trial and appellate counsel, Dell v. United States, 710 F.3d 1267, 1273 (11th Cir. 2013). Under the first prong, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688. In this regard,

"[a] petitioner must overcome a strong presumption of competence, and the court must give significant deference to the attorney's decisions." Hagins v. United States, 267 F.3d 1202, 1204-05 (11th Cir. 2001). "An attorney's actions need only fall within 'the wide range of professionally competent assistance' to pass constitutional muster," and "courts should not second-guess counsel's assistance" because "[e]ven the best criminal defense attorneys would not defend a particular client the same way." Philmore v McNeil, 575 F.3d 1251, 1260 (11th Cir. 2009) (citations omitted).

Strategic decisions are entitled to a "heavy measure of deference." Strickland, 466 U.S. at 691. "[A] court should be highly deferential to those choices made by defense counsel in the conduct of a trial that are arguably dictated by a reasonable trial strategy." Devier v. Zant, 3 F.3d 1445, 1450 (11th Cir. 1993). "Which witnesses, if any, to call . . . is the epitome of a strategic decision, and it is one that [the Court] will seldom, if ever, second guess." Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc). Indeed, "strategic choices are 'virtually unchallengeable.'" Provenzano v. Singletary, 148 F.3d 1327, 1332 (11th Cir. 1998) (citing Strickland, 466 U.S. at 690 and Waters, 46 F.3d at 1522). "[C]ounsel will not be deemed unconstitutionally deficient because of tactical decisions . . . , and [t]he presumption of reasonableness is even stronger when we are reviewing the performance of an experienced trial counsel." Michael v. Crosby, 430 F.3d 1310, 1320 (11th Cir. 2005) (internal citations omitted). Notably, however, "the mere incantation of the word 'strategy' does not insulate attorney behavior from review. The attorney's choice of tactic must be reasonable under the circumstances." Cave v. Singletary, 971 F.2d 1513, 1518 (11th Cir 1992).

To show that an attorney's choice of strategy is unreasonable, a petitioner must show that no competent counsel would have made such a choice. Strickland, 466 U.S. at 690; Adams

31

v. Wainwright, 709 F.2d 1443, 1445 (11th Cir. 1983) (*per curiam*) ("Even if in retrospect the strategy appears to have been wrong, the decision will be held ineffective only if it was so patently unreasonable that no competent attorney would have chosen it." (citations omitted)). The purpose of this review is not to grade counsel's performance because, of course, every lawyer "could have done something more or different. . . .  But, the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (*en banc*).  Strickland requires application of a totality-of-the-circumstances standard because "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Khan v. United States, 928 F.3d 1264, 1273 (11th Cir. 2019) (citation omitted).

"Given the strong presumption in favor of competence, the petitioner's burden of persuasion – though the presumption is not insurmountable – is a heavy one." Fugate v. Head, 261 F.3d 1206, 1217 (11th Cir. 2001) (citation omitted).  "The test has nothing to do with what the best lawyers would have done.  Nor is the test even what most good lawyers would have done.  We ask only whether some reasonable lawyer . . . could have acted, in the circumstances, as defense counsel acted . . . ." Ward v. Hall, 592 F.3d 1144, 1164 (11th Cir. 2010) (citing Waters, 46 F.3d at 1512).  "The reasonableness of counsel's performance is evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances . . . ." Michael, 430 F.3d at 1319 (citations omitted)

As emphasized by the Eleventh Circuit:

[D]eferential review under Strickland does not ask whether counsel could possibly or ideally have been more effective.  "The test for ineffectiveness is not whether counsel could have done more."  We do not ask whether an attorney's

32

representation "deviated from best practices or common custom," and we should resist the temptation to second-guess an attorney with the benefit of our hindsight.   Rather, Strickland asks only "whether, in light of all the circumstances, the identified acts or omissions were outside the range of professionally competent assistance." . . . We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial. . . .  We are not interested in grading lawyers' performances.

Jenkins v. Comm'r, Ala. Dep't of Corr., 963 F.3d 1248, 1269-70 (11th Cir. 2020) (internal citations omitted).

## B.        AEDPA Double Deference Framework

In the context of an ineffective assistance claim that was previously rejected by a state court, the petitioner bears the even heavier burden of "show[ing] that the [state courts] applied Strickland to the facts of his case in an objectively unreasonable manner."  Bell v. Cone, 535 U.S. 685, 699 (2002); see also Cave v. Sec'y for Dep't of Corr., 638 F.3d 739, 748 (11th Cir. 2011) (noting that, where the state court has previously adjudicated a claim on the merits, the petitioner "has the additional burden of demonstrating that the state court's application of this demanding standard was not merely wrong, but objectively unreasonable").  "[I]t is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly."  Bell, 535 U.S. at 699.  That is, the question is not whether counsel's performance fell below Strickland's standard.  Gavin v. Comm'r, Ala. Dep't of Corr., 40 F.4th 1247, 1264 (11th Cir. 2022).

> Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court.  Under AEDPA, though, it is a necessary premise that the two questions are different . . . [for] [a] state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.

Id. (citing Harrington, 562 U.S. at 101).

33

"Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Richter, 562 U.S. at 105.  "The Strickland inquiry and the § 2254(d) inquiries are distinct," and for purposes of § 2254(d), clear error will not suffice; "the state court's application of clearly established federal law must be objectively unreasonable, not merely wrong."  Gavin, 40 F.4th at 1266; see also Barwick v. Sec'y, Fla. Dep't of Corr., 794 F.3d 1239, 1245 (11th Cir. 2015) ("In short, an *unreasonable* application of federal law is different from an *incorrect* application of federal law." (internal quotations and citations omitted)).

Stated otherwise, federal habeas corpus relief is available on a Strickland claim "only if the state habeas court *unreasonably* determined that trial counsel performed reasonably - *i.e.*, where there is no possibility fairminded jurists could disagree that defense counsel acted outside the range of professionally competent assistance. . . ."  Ledford v. Warden, Ga. Diagnostic Prison, 975 F.3d 1145, 1158 (11th Cir. 2020) (internal quotation marks and citations omitted).  For Petitioner "to prevail, then, he would have to show that *no* reasonable jurist could find that his counsel's performance fell within the wide range of reasonable professional conduct." Raheem v. GDCP Warden, 995 F.3d 895, 909 (11th Cir. 2021).  "Or, in more concrete terms, a federal court may grant relief only if *every* 'fairminded juris[t]' would agree that *every* reasonable lawyer would have made a different decision." Dunn v. Reeves, 594 U.S. 731, 739-40 (2021) (*per curiam*) (emphasis in original) (citation omitted). "Surmounting Strickland's high bar is never an easy task." Richter, 562 U.S. at 105 (citing Padilla v. Kentucky, 559 U.S. 356, 371 (2010)).

34

Moreover, because "[t]he standards created by Strickland and § 2254(d) are both highly deferential, . . . when the two apply in tandem, review is doubly so." Richter, 562 U.S. at 105 (quotation marks and citations omitted); see also Yarborough v. Gentry, 540 U.S. 1, 4 (2003) (review of attorney performance is "highly deferential-and doubly deferential when it is conducted through the lens of federal habeas"). "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment . . . . [F]ederal courts are to afford both the state court and the defense attorney the benefit of the doubt." Woods v. Etherton, 578 U.S. 113, 117 (2016) (*per curiam*) (internal quotations and citations omitted).

Under the prejudice prong of Strickland, a petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. As the Eleventh Circuit has ruled, a petitioner must affirmatively prove prejudice that would undermine the results of the proceedings because "attorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial. That the errors had some conceivable effect on the outcome of the proceeding is insufficient to show prejudice." Butcher v. United States, 368 F.3d 1290, 1293 (11th Cir. 2004) (citations and internal quotations omitted). Indeed, the Court must examine the entirety of counsel's performance and the effect of such "in light of the record as a whole to determine whether it was reasonably probable that the outcome would have been different." Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989).

Particular to appellate counsel, there is no ineffective assistance for failing to raise claims "reasonably considered to be without merit." United States v. Nyhuis, 211 F.3d 1340, 1344 (11th Cir. 2000) (citation omitted). Moreover, it is up to appellate counsel to winnow out weaker arguments, even if they may have merit, and select the most promising issues for review. Jones v. Barnes, 463 U.S. 745, 751-52 (1983); Philmore, 575 F.3d at 1264. Prejudice turns on whether "the neglected claim would have a reasonable probability of success on appeal." Philmore, 575 F.3d at 1265 (citation omitted).

Thus, to determine whether appellate counsel's failure to raise a claim on appeal resulted in prejudice, the Court reviews the merits of the omitted claim. Eagle v. Linahan, 279 F.3d 926, 943 (11th Cir. 2001) (citation omitted); see also Hawes v. Perry, 633 F. App'x 720, 725 (11th Cir. 2015) (per curiam) ("Thus, although [the petitioner] claims that his appellate counsel was ineffective, the analysis collapses to whether the underlying issue (here, ineffective assistance of trial counsel) is meritorious." (citation omitted)). To establish prejudice from trial counsel's performance, there must be a substantial likelihood that a factfinder would have a reasonable doubt respecting guilt, not just a conceivable likelihood. See Harrington, 562 U.S. at 112. The Court considers the potential prejudice in light of the other evidence presented at trial in determining whether there was "any real possibility" of acquittal. Id. at 112-13; see also Black v. United States, 373 F.3d 1140, 1146, 1147 (11th Cir. 2004) (considering entirety of trial evidence regarding type of drugs distributed to determine whether petitioner was prejudiced by any appellate counsel deficiency in failing to raise issue regarding potential for reduced sentence based on verdict form which did not indicate which drugs jury found to have been object of conspiracy).

"[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Strickland, 466 U.S. at 696. "If . . . the omitted claim would have had a reasonable probability of success, then [appellate] counsel's performance was necessarily prejudicial because it affected the outcome of the appeal." Eagle, 279 F.3d at 943. The inquiry "is not wholly dissimilar from the inquiry used to determine whether counsel performed deficiently in the first place; specifically, both may be satisfied if the defendant shows nonfrivolous grounds for appeal." Roe v. Flores-Ortega, 528 U.S. 470, 486 (2000).

### C.      Looking Through the Georgia Supreme Court CPC Denial

The Georgia Supreme Court denied Petitioner's request for a CPC concerning denial of the state habeas petition in a two-sentence order: "Upon consideration of the application for certificate of probable cause to appeal the denial of habeas corpus, it is ordered that it be hereby denied. All the justices concur." (Doc. no. 11-9.) Because this decision was not accompanied with reasons, this Court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" when determining, pursuant to 28 U.S.C. § 2254(d), whether the state court decision was reasonable. Wilson v. Sellers, 584 U.S. 122, 125 (2018).

## III.    DISCUSSION

### A.      Overview

In the sections that follow, the Court rejects as unreasonable the state habeas court's conclusion that trial and appellate counsel did not perform deficiently by failing to raise the alibi and handedness issues. However, Grounds A, E, and F still fail because the state habeas court's determination that there was no prejudice, while arguably incorrect, is within the realm

37

of reason and thus entitled to AEDPA deference.  Ground B fails because the trial court did not err in excluding the alibi witnesses due to trial counsel's failure to timely submit a witness list.  Ground C fails because the trial court did not err in overruling objections to Investigator Beckham's testimony concerning information conveyed by other investigating officers. Ground D fails because it is procedurally defaulted.

**B.      Despite Obvious Deficient Performance by Messrs. Bravo and Winchester in Their Failure to Raise the Alibi Defense, the State Habeas Court's Finding of No Prejudice Was Not Unreasonable**

Petitioner argues the state habeas court unreasonably concluded that Mr. Winchester was not ineffective for failing to appeal Mr. Bravo's failure to present the alibi defense.  He argues Mr. Bravo should have known about the alibi defense, and the defense was strong in comparison to the State's weak case.  As a result, Mr. Winchester's failure to raise this issue on appeal was deficient and prejudicial.  (Doc. no. 14, pp. 11-25.)  Respondent contends the state habeas court reasonably concluded it was Petitioner's fault that Mr. Bravo did not learn about the defense earlier, and there is no prejudice because Ms. Brown's testimony was not credible.  (Doc. no. 10-1, pp. 11-14.)  As explained below, were this the direct appeal or state habeas proceedings, the Court would agree with Petitioner that Messrs. Bravo and Winchester's assistance was deficient and prejudicial.  However, while the state habeas court's finding of no deficiency was "so obviously wrong that its error lies beyond any possibility for fairminded disagreement," Pye v. Warden, Ga. Diagnostic Prison, 50 F.4th 1025, 1034 (11th Cir. 2022) (*en banc*) (internal quotations and citations omitted), its finding of no prejudice is not so obviously wrong.  Therefore, AEDPA deference defeats Ground A on the prejudice prong.

### 1.      Deficient Performance by Mr. Bravo

The state habeas court blamed Petitioner for Mr. Bravo's failure to present the alibi defense, finding (1) Mr. Bravo met with Petitioner in advance of trial and specifically inquired about any potential alibi defense and witnesses, but Petitioner never disclosed any; and (2) Petitioner failed to inform Mr. Bravo of the alibi defense and witnesses until the second day of trial.   After careful review of the state habeas record, however, clear and convincing evidence proves both of these factual findings are incorrect, and the resulting conclusion of no deficiency lies beyond any possibility for fairminded disagreement.

First, the state habeas court unreasonably concluded Mr. Bravo was ignorant of the defense despite reasonably competent efforts as defense counsel.  Indeed, it is indisputable that Mr. Bravo would have known about the alibi defense from the very start of representing Petitioner had he made any effort to review the docket and read the two alibi notices and supporting witness statements filed by Mr. Hadden two years before trial.  Any competent counsel would have reviewed the docket, read the two alibi notices, and fully investigated the defense.  Mr. Bravo did none of that.

Second, the state habeas court unreasonably found Mr. Bravo asked Petitioner about any potential alibi defense in their pretrial meetings.  While Mr. Bravo testified it was his custom and practice to do so, he could not recall whether he did so with Petitioner.  (Tr. 18.) In contrast, Petitioner testified unequivocally that Mr. Bravo never raised the issue with him, and he never raised it with Mr. Bravo because he assumed Mr. Bravo would pick up where Mr. Hadden left off by calling the witnesses listed in the alibi notices.  (Tr. 65-66.)  The incorrectness of this assumption was laid bare on the second day of trial when Petitioner realized Mr. Bravo had no witnesses to call in his defense and asked why Mr. Bravo was not

calling the alibi witnesses. (Tr. 68-69.) Critically, and consistent with Petitioner's testimony, Mr. Bravo begged the Court for permission to call the alibi witnesses and explained his first knowledge of the alibi defense was his conversation with Petitioner that morning.

Third, Mr. Bravo was wrong about important details. When asked to describe work outside of trial he performed, Mr. Bravo testified he filed pretrial discovery motions and motions in limine and a post-trial motion for new trial. (Tr. 8.) In reality, however, he filed no pretrial motions, and Mr. Winchester filed the motion for new trial. (Tr. 8-9.) Mr. Bravo described Petitioner's alibi as being "in Philadelphia" rather than in Augusta with his family. (Tr. 11.) Mr. Bravo could not recall who Amber Brown was. (Tr. 14.) He could not recall whether he ever spoke with any of the four alibi witnesses, noting any conversation would have occurred during the trial when he first learned about the alibi defense. (Tr. 20-21.) Mr. Bravo testified he met with Petitioner multiple times before trial but could not state the number of meetings with any precision because his office misplaced Petitioner's file. (Tr. 7.)

In direct conflict with its first finding that Petitioner was to blame for Mr. Bravo's ignorance, the state habeas court later characterized Mr. Bravo's failure to present the alibi defense as a "tactical decision" without any further explanation. (Doc. no. 1-6, p. 8.) It is true Mr. Bravo made vague references to strategy and tactics during his testimony, but he never explained why it was strategic or tactical, and "the mere incantation of the word 'strategy' does not insulate attorney behavior from review." Cave, 971 F.2d at 1518.

Mr. Bravo could not have thought strategically about whether to call the alibi witnesses in advance of trial because, as the state habeas court found, Mr. Bravo had no idea the alibi defense existed until the second day of trial. Mr. Bravo certainly decided strategy dictated presentation of the alibi witnesses once he learned of their existence, and he emphasized their

40

critical importance to the trial judge when pleading for permission to present them.  (Doc. no. 14, p. 17.)  The state habeas court glossed over these discrepancies and cited Mr. Bravo's contradictory statements as true without reconciling them.  See, e.g., French v. Warden, Wilcox State Prison, 790 F.3d 1259, 1268-69 (11th Cir. 2015) (finding state habeas determined facts unreasonably "when it simply accepted the attorney's testimony that he 'went through the proper procedures'").

After carefully evaluating all of the circumstances from Mr. Bravo's perspective at the time, no competent counsel would have failed to be apprised of, investigate and be prepared to present the alibi defense at trial, and his actions were far outside the range of professionally competent assistance.  See, e.g., Buhs v. Sec'y, Fla. Dep't of Corr., 809 F. App'x 619, 631 (11th Cir. 2020) (per curiam) ("If [defense counsel] did not investigate the [] defense because of neglect or oversight, then it is possible that his performance was deficient."); see also Couch v. Booker, 632 F.3d 241, 246 (6th Cir. 2011) ("[A] lawyer cannot make a protected strategic decision without investigating the potential bases for it."); Pavel v. Hollins, 261 F.3d 210, 220-21 (2d Cir. 2001) (counsel's failure to call petitioner's mother as alibi witness "was based on an inadequate investigation" because, "at the very least, [counsel] should have directly contacted [the witness] - to learn more about the testimony that she would have offered, and to determine whether she might serve as a suitable witness based, inter alia, on his assessment of her credibility"); Pena-Martinez v. Duncan, 112 F. App'x 113, 114 (2d Cir. 2004) ("[C]ounsel's failure to investigate alibi witnesses is particularly egregious."); Poindexter v. Booker, 301 F. App'x 522, 528 (6th Cir. 2008) ( "[W] have [ ] granted habeas relief when counsel failed to investigate, particularly when counsel declined to interview key defense witnesses." (emphasis omitted)); Grooms v. Solem, 923 F.2d 88, 90 (8th Cir. 1991) ("Once a

41

defendant identifies potential eyewitnesses, it is unreasonable not to make some effort to contact [alibi witnesses] to ascertain whether their testimony would aid the defense."); Crisp v. Duckworth, 743 F.2d 580, 584 (7th Cir. 1984) ("[A]n attorney who fails even to interview a readily available witness whose noncumulative testimony may potentially aid the defense should not be allowed automatically to defend his omission simply by raising the shield of 'trial strategy and tactics[.]'"); McCollough v. Bennett, No. 02–CV–5230, 2010 WL 114253, at *11 (E.D.N.Y. Jan. 12, 2010) ("A failure to investigate alibi witnesses is particularly egregious.").

Georgia courts often find trial counsel not ineffective for failing to raise an alibi defense where, unlike here, defense counsel conducted a reasonable investigation and could thus articulate strategic reasons to forego the defense.  See, e.g., Upton v. Parks, 664 S.E.2d 196, 199-200 (Ga. 2008) (finding decision not to call alibi witnesses was "fully considered and well-reasoned . . . under the circumstances" when made after debate between two defense attorneys and discussion with defendant); Blalock v. State, 911 S.E.2d 628, 637-38 (Ga. 2025) (finding trial counsel made reasonable decision after conducting mock examination of defendant and analyzing trial evidence that contradicted alibi); Smith v. State, 839 S.E.2d 630, 639-40 (Ga. 2020) (finding same where trial counsel compared girlfriend's weak alibi story to convincing testimony of multiple witnesses who placed defendant at crime scene).

For these reasons, the state habeas court's determination that Mr. Bravo did not render deficient performance was an unreasonable application of Strickland and there is no possibility that any fairminded jurist could agree with its determination.  Pye, 50 4th at 1041-42.

### 2.   Deficient Performance by Mr. Winchester

Mr. Winchester was also clearly deficient in failing to raise Mr. Bravo's ineffectiveness on appeal.  The state habeas court deferred to Mr. Winchester's decision not to raise this issue because he would have had to overcome Mr. Bravo's representation that Petitioner did not inform him of the alibi defense, as well as Mr. Bravo's remark to the trial judge that his decision not to pursue the alibi defense was strategic. (Doc. no. 1-6, pp. 7, 9.)  The state habeas court's determination that Mr. Winchester's performance on appeal was not deficient was an unreasonable application of Strickland, and there is no possibility that any fairminded jurist could agree with this determination.

Mr. Winchester's only justification for failing to raise this argument was reliance on Mr. Bravo's assertion of strategy and tactics.  However, the record does not support a finding that Mr. Bravo employed either strategy or tactics.  Mr. Winchester should have known that Mr. Bravo's attempt to shift the blame for his ignorance to his client was futile because Mr. Hadden filed two alibi notices and supporting witness statements before Mr. Bravo entered the case.  Furthermore, Mr. Winchester should have known there was no strategy to Mr. Bravo failing to apprise himself of the alibi defense until it was too late to raise it, then losing a last-minute plea to present the alibi defense because he failed to submit a witness list by the deadline of ten days prior to trial.  Simply stated, it was deficient for Mr. Winchester to rely on Mr. Bravo's incantation of the buzz words "strategy" and "tactics" when the trial transcript so easily revealed their emptiness and baseless nature.

As the Eleventh Circuit has long held, appellate counsel need not raise every possible issue on appeal and may wield the winnowing fork to cull out weaker arguments that still have merit.  See Overstreet v. Warden, 811 F.3d 1283, 1287 (11th Cir. 2016).  "Generally, only

43

when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." Id. (internal quotations removed). Here, it is abundantly clear that Mr. Winchester chose to raise far weaker issues because the entirety of the appeal consisted of Mr. Winchester challenging seemingly innocuous statements by the trial judge during testimony by Miss Howard and Investigator Beckman. See Felton, 819 S.E.2d at 464-68. As the Georgia Supreme Court pointed out: (1) the challenged comments concerning anonymous phone calls occurred during oral argument on evidentiary objections; (2) clarifying questions to the investigator were entirely appropriate; (3) none of the challenged remarks concerned "the credibility of either witness and so the appellant's assertion of improper bolstering is without merit"; and (4) remarks on such ancillary issues could not have affected the outcome. Id. at 467-68. For these reasons, Mr. Winchester's failure to raise the alibi defense on appeal falls outside the range of professionally competent assistance.

These failures prove incompetence, and Mr. Winchester should have understood this at the time he prepared the appeal, although he understood this by the time of the state habeas hearing. At the hearing, Mr. Winchester conceded he "should have investigated" but "didn't take any steps to investigate [the] people that were listed on the [alibi] notice." (Tr. 40-41, 47.) He explained "the only reason I can think of" for not raising the alibi defense on appeal was Mr. Bravo's use of the terms "strategic and tactics" in his plea to the trial judge. (Tr. 40-41.) As explained above, however, Mr. Bravo's invocation of these words contradicted his own admission to the trial judge of being ignorant of the defense until the second day of trial, when it was far too late, and the emptiness of these words should have been plainly obvious to any reasonable appellate attorney from even a cursory review of the trial transcript and docket.

After carefully evaluating all of the circumstances from Mr. Winchester's perspective

44

at the time, no competent counsel would have failed to raise the alibi issue on appeal, and his actions were far outside the range of professionally competent assistance. The state habeas court's contrary conclusion is unreasonable and beyond the possibility for fairminded disagreement among jurists.

### 3. The Prejudicial Impact of Counsels' Deficient Performance

If the Court were deciding this issue in the first instance, the Court would conclude there is a reasonable probability Petitioner would have won the appeal had Mr. Winchester raised Mr. Bravo's failure to present the alibi defense. To understand why, one must understand the comparative strength of the State's case and the alibi defense. As detailed in Section I *supra*, the State's entire case hinged on Miss Howard's identification of Petitioner as the stranger who shot Mr. Wright, and an unexplained contact of 105 seconds between Petitioner's cell phone and Mr. Johnson's cell phone, the latter of which was found at the scene. There was no physical evidence implicating Petitioner. There was no evidence of motive. Mr. Wright and Petitioner were complete strangers.

Against this scant evidence of guilt, Mr. Hadden filed two alibi notices disclosing four witnesses (Amber, Olivia, Taylor, and Miya Brown) who would testify Petitioner worked at a restaurant until 10:00 p.m., then traveled to and remained at home until the next morning except for a brief trip after midnight with Amber Brown to buy medicine for their son at Walmart. Critically, however, Ms. Brown was the only witness of the four who testified in support of the alibi defense at the state habeas hearing.

Reduced to its essence, the state habeas court rejected Ms. Brown's testimony concerning the alibi defense as not credible because (1) as his girlfriend, she was biased in favor of Petitioner; (2) a jury could find her testimony inculpatory because it placed Petitioner

outside of the home with a female around the time of the shooting in a small car, and Ms. Brown owned a small Ford Focus but failed to recall basic details such as the color and the time period of ownership; and (3) there was no corroborating evidence such as proof of the Walmart purchase, which was made with a credit card belonging to Amber Brown's mother rather than her own. (Doc. no. 1-6, pp. 8-9 & n.3.)

Certainly, Ms. Brown was biased as Petitioner's girlfriend and mother of his children. But to characterize Ms. Brown's testimony as inculpatory, one must reject her testimony and concoct a different narrative. Ms. Brown testified Petitioner returned home from work around 10:00 p.m. and stayed there until they left together for a brief trip to Walmart in her mother's big white SUV between midnight and 1:00 a.m. Nothing about this testimony is inculpatory. It places Petitioner inside the home with his entire family and in bed at the time of the shooting, followed by a brief trip to Walmart after midnight in a big white SUV that is entirely different than the small red Honda with a license plate ending in 505JP described by Miss Howard as the getaway car. If Ms. Brown's testimony is true, Petitioner could not have committed the murder.

A jury might have rejected her testimony based on bias, inconsistencies, and lack of corroborating evidence. But nothing about her testimony is inherently flawed or at odds with other evidence, and jurors should have had the chance to make up their own minds regarding the credibility of her testimony. For these reasons, there was a reasonable probability of an acquittal had Mr. Bravo called her to the stand, especially considering the weak case presented by the State.

The state habeas court also pointed to the lack of a receipt confirming the purchase at Walmart. (Doc. no. 1-6, p. 9.) In so doing, the state habeas court ignored proof in the record

46

that Mr. Bravo, not Petitioner, was to blame for failing to preserve proof of the Walmart purchase. In her 2012 alibi notice, Ms. Brown stated she paid with her mother's credit/debit card and was "looking up her bank statement at this time." (Tr. 743.) Consistent with this statement, Ms. Brown testified at the state habeas hearing that she saved a screenshot of the Walmart charge to her phone but no longer had it due to the passage of nine years between the alibi statement in 2012 and her habeas testimony in 2021, and her going through so many phone replacements in the interim. (Tr. 59-60.)

Ms. Brown testified she gave the screenshot to Mr. Bravo. (Tr. 60.) While no one asked Mr. Bravo whether Ms. Brown gave him the screenshot, Mr. Bravo admitted that Petitioner told him during trial preparation that Ms. Brown had a receipt from the Walmart purchase, but for reasons not explained by Mr. Bravo he apparently never made any effort to obtain the receipt. (Tr. 34-35.) Either he lost the receipt or never asked for it. Either way, his performance was clearly deficient. Rather than detracting from the credibility of Ms. Brown's testimony, these details concerning the absence of proof for the Walmart purchase reinforce the undeniable truth that Mr. Bravo was ineffective, and his poor performance was prejudicial.

For all of these reasons, if the Court were deciding this issue in a different posture, the Court would conclude there is a reasonable probability of an acquittal had Mr. Bravo presented the alibi defense, and a reasonable probability of a reversal had Mr. Winchester raised the issue on appeal. Georgia courts find prejudice on appeal where, as here, a conviction is procured by weak evidence of guilt, often in the form of a single eyewitness identification with no physical evidence, and the defense attorney fails to present alibi testimony. See, e.g. Cartwright v. Caldwell, 825 S.E.2d 168 (Ga. 2019) (finding prejudice existed where (1) evidence of guilt was weak and consisted of four questionable witness identifications and no physical evidence

47

linking defendant to shooting; and (2) defense counsel presented five family members as alibi witnesses but failed to call detective to rebut state's contention defendant concocted alibi); Tenorio v. State, 583 S.E.2d 269 (Ga. Ct. App. 2003) (finding prejudice in robbery conviction with (1) weak evidence of guilt based solely on one witness's identification and no physical evidence tying defendant to crime; and (2) defense counsel failing to call disinterred alibi witnesses to buttress testimony by two alibi witnesses who had strong ties to defendant); Richardson v. State, 375 S.E.2d 59 (Ga. Ct. App. 1988) (finding prejudice existed where (1) evidence of guilt rested largely on identification testimony of one witness; and (2) defense attorney failed to present two alibi witnesses and suppress damning facemask evidence found during unconstitutional search of backpack).  Despite these concerns, the state habeas court's determination of no prejudice is entitled to AEDPA deference for the reasons explained in the next section.

## 4.    The State Habeas Court's Finding of No Prejudice is Entitled to AEDPA Deference

While the state habeas court's finding of no prejudice is incorrect, the Court cannot go so far as to say it was beyond the realm of reason.  Georgia courts often characterize as weak and not supportive of a finding of prejudice the failure to call a single alibi witness, or even multiple alibi witnesses, who have close ties to the defendant and thus a vested interest in acquittal.  See Jones v. State, 598 S.E.2d 65 (Ga. Ct. App. 2004) (finding no prejudice in robbery conviction where only alibi evidence was uncorroborated testimony of defendant's girlfriend, who testified she still loved him and did not want anything bad to happen to him); Tenorio v. State, 583 S.E.2d 269 (Ga. Ct. App. 2003) (faulting defense counsel for failing to

48

find alibi witnesses to support biased testimony by two alibi witnesses with strong ties to defendant).

Furthermore, as the state habeas court found, there are questionable aspects of Ms. Brown's testimony, such as her obvious bias and her inability to remember the color of her Ford Focus and whether it was repossessed before the murder. And while who to blame for the lack of a Walmart receipt or other proof of purchase is unclear, it is undisputed Petitioner never produced any corroborating evidence of the alibi defense. "By contrast," as the state habeas court explained, Miss Howard had a clear vantage point from mere feet away, she identified Petitioner as the shooter in a lineup after declining to identify anyone in prior lineups, and investigators "linked Petitioner to the victim through cell-phone records which provided the basis for the inclusion in the photographic line-up." (Doc. no. 1-6, p. 9 n.5.) For these reasons, the state habeas court's finding of no prejudice is not unreasonable, and it is possible that fairminded jurists could agree with the state habeas court's rationale. Accordingly, Ground A fails.

C.      **Despite Obvious Deficient Performance by Messrs. Bravo and Winchester in Their Failure to Raise the Handedness Defense, Ground E Fails Because the State Habeas Court's Finding of No Prejudice Was Not Unreasonable**

Petitioner asserts Mr. Winchester should have raised on appeal Mr. Bravo's failure to present exculpatory evidence that Petitioner was right-handed and could not be the shooter, whom Miss Howard testified drew aggressively and shot with his left hand. (Doc. no. 14, pp. 31-33.) Respondent contends there is no prejudice because the jury observed Petitioner taking handwritten notes with his right hand during the trial, as confirmed by the question posed by the jury to the trial judge. (Doc. no. 10-1, p. 22.) The state habeas court denied relief on this

49

ground generally by (1) noting Petitioner argued "several other aspects of ineffective assistance of trial counsel that were not raised on appeal;" (2) finding as to these "other aspects" that Mr. Bravo presented a meaningful and constitutionally adequate defense at trial and Petitioner was not prejudiced by Mr. Bravo's representation. (Doc. no. 1-6, p. 10.)

As explained below, the Court agrees with Petitioner that Messrs. Bravo and Winchester's assistance was deficient, and the state habeas court's contrary determination is unreasonable. AEDPA deference still defeats Ground F, however, because the state habeas court's determination of no prejudice is not unreasonable or beyond disagreement of fairminded jurists.

### 1.    Mr. Bravo's Deficient Performance and Resulting Prejudice

At trial, Miss Howard testified the shooter used his left hand to pull a revolver "aggressively" out of his pants and shoot Mr. Wright four times in quick succession while advancing toward Mr. Wright as he retreated. (Tr. 134-38, 169-72.) Mr. Bravo failed to present any evidence that Petitioner is right-handed with no ability to use his left hand for activities requiring dexterity. Nor did Mr. Bravo point out during closing arguments the glaring inconsistency between Petitioner's handedness and Miss Howard's unequivocal testimony, despite her being the sole eyewitness to the murder.

Hearing no evidence of Petitioner's handedness during trial but observing Petitioner taking handwritten notes with his right hand, the jury submitted a written question to the trial judge as follows:

> The jury's [sic] requested clarification on which hand was used to draw the weapon. Would there be a difference in if there was a right-handed shooter versus a left-handed shooter? The jury heard evidence the shooter, Felton, pulled the gun and shot with his left hand. We noticed he, Mr. Felton, writes with is right hand."

(Tr. 489.)  The trial judge answered by explaining that the court could not comment on the evidence.  (Tr. 489.)

At the state habeas hearing, Ms. Brown testified Petitioner is right-handed and "can't do anything with his left" hand.  (Tr. 57.)  Mr. Bravo testified he did not know why he failed to call any witnesses to talk about Petitioner's handedness and why he never bothered to mention during closing arguments that Miss Howard testified the shooter was left-handed and Petitioner is right-handed.  (Tr. 25-26.)

Mr. Winchester explained why he did not raise this issue on appeal as follows:  "If the jury acknowledged that it saw that [Petitioner] was not left-handed, then I don't know what calling a witness could tell them what they already knew would have done differently.  I . . . don't know . . . how that fact would be prejudicial."  (Tr. 43.)  The state habeas court denied relief on this ground generally by (1) noting Petitioner argued "several other aspects of ineffective assistance of trial counsel that were not raised on appeal;" (2) finding as to these "other aspects" that Mr. Bravo presented a meaningful and constitutionally adequate defense at trial and Petitioner was not prejudiced by Mr. Bravo's representation.  (Doc. no. 1-6, p. 10.)

Mr. Bravo performed deficiently by failing to present evidence and argument that Petitioner is right-handed, he is not ambidextrous, and indeed he is incapable of performing any act with his left hand that requires skill or dexterity such as the rapid drawing and shooting of a revolver.  Absent this evidence, the jury struggled to reconcile Miss Howard's testimony of the shooter using his left hand to draw the revolver aggressively and fire rapidly with its own observations of Petitioner taking notes with his right hand.  Mr. Bravo should have called Petitioner, Ms. Brown, or another witness who knows Petitioner, to testify that Petitioner is

51

incapable of using his left hand in such a manner, which would have called into serious question Miss Howard's identification of Petitioner as the left-handed shooter. Mr. Bravo's failure to present this exculpatory evidence falls far outside the wide range of professionally competent assistance. Any competent counsel would have presented evidence of Petitioner's handedness and pointed out the obvious resulting conflict with Ms. Brown's eyewitness identification of him as the shooter. The state habeas court unreasonably applied Strickland when concluding that Mr. Bravo performed within the wide range of professionally competent assistance, and there is no possibility any fairminded jurist would agree with the state habeas court.

The prejudice from such shocking incompetence is compelling, particularly in light of the weak evidence of guilt. It was paramount for the defense to attack the sole eyewitness's identification of Petitioner as the shooter. The jury confirmed through the question its mere observation that Petitioner wrote notes during trial with his right hand, evidencing its lack of knowledge as to his ability to use his left hand. The question underscores the jury's disquiet with the complete absence of evidence or argument concerning Petitioner's handedness generally and more importantly the dexterity of his left hand. The jury's pronouncement of its predicament, and its cry for help from the trial court, suggests a different trial outcome was reasonably probable had Mr. Bravo offered any evidence and argument. Indeed, the jury asked, "***Would there be a difference*** in if there was a right-handed versus a left-handed shooter?" (Tr. 489 (emphasis added).)

For these reasons, were this Court deciding this issue on direct appeal or in the state habeas proceedings, the Court would conclude there is a reasonable probability of an acquittal had Mr. Bravo bothered to present evidence Petitioner was indeed right-handed and could not

52

use his left hand for intricate actions that require precision, control, and speed.  This is especially true where, as here, the verdict is "'weakly supported by the record'" and thus "'more likely to have been affected by errors' . . . because the failure of counsel to pursue a defense capable of instilling 'reasonable doubt respecting guilt' can make the difference between conviction and acquittal.'"  Daniel v. Curtin, 499 F. App'x 400, 411 (6th Cir. 2012) (quoting Strickland, 466 U.S. at 695-96); see also State v. Walker, 758 S.E.2d 836, 837-39 (Ga. Ct. App. 2014) (finding prejudice in trial counsel's failure to call two witnesses who would testify defendant did not harm or falsely imprison victim where state's evidence "was not overwhelming" and "rest[ed] largely upon the . . . testimony of one witness").

### 2. Mr. Winchester's Deficient Performance and Its Prejudicial Impact

Likewise, the state habeas court incorrectly applied Strickland by finding Mr. Winchester's failure to appeal the handedness issue fell within the wide range of professionally competent appellate assistance.  Mr. Winchester perceived the jury question as an acknowledgement of the jury's understanding that Petitioner was not left-handed, and he did not "know what calling a witness could tell them that they already knew would have done differently. . . . I don't know how . . . the omission of that fact would be prejudicial." (Tr. 43.) For the reasons explained above, Mr. Winchester infers far too much from the jury question, which evidences the jury's abject confusion rather than its understanding.  The jury did not know to what extent Petitioner could use his left hand, and the jury understood the answer was relevant to its determination.  Finally, for the same reasons explained in Section III.B.3 *supra* with respect to the alibi defense, the mundane issues raised by Mr. Winchester on appeal were destined to fail and far weaker than the handedness issue.  Accordingly, Mr. Winchester's failure to raise the handedness issue on appeal falls outside the range of professionally

competent assistance.  The state habeas court's contrary conclusion is unreasonable, and there is no possibility any fairminded jurist would agree with the state habeas court.  Furthermore, were this Court deciding the issue within the context of the state habeas proceeding, it would conclude there is a reasonable probability of a reversal had Mr. Bravo Winchester raised the handedness issue on appeal.

### 3.    The State Habeas Court's Finding of No Prejudice is Entitled to AEDPA Deference

Even though there was clearly deficient performance by both attorneys, the Court cannot grant relief on Ground E because the state habeas court's finding of no prejudice was not an unreasonable application of <u>Strickland</u>.  Simply stated, there is merit to the point that the jury observed Petitioner taking handwritten notes with his right hand during the dayslong trial, noted this observation in their question to the trial judge, and yet still unanimously voted to find Petitioner guilty.  (Doc. no. 10-1, p. 22.)  This reasoning of the state habeas court is not so obviously wrong that it can be fairly characterized as unreasonable and beyond any possibility for fairminded disagreement.  Accordingly, while the state habeas court erred regarding deficient performance, the AEDPA deference owed to its finding of no prejudice demands denial of Ground E.

### D.    Ground F Fails, Despite the Cumulative Errors of Counsel, Because the State Habeas Court's Finding of No Prejudice Is Not Objectively Unreasonable When Applying AEDPA Deference

Ground F states in full as follows:

INDIVIDUALLY AND CUMULATIVELY, APPELLATE COUNSEL'S INEFFECTIVENESS PREJUDICED MR. FELTON.

Both on their own and cumulatively, under *Strickland*, appellate counsel's errors warrant habeas relief.  The cumulative error doctrine

provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Baker*, 432 F.3d 1189, 1223 (11th Cir. 2005) (internal quotation marks omitted). In this case, because of the errors outlined above in Petitioner's pretrial, trial, and appellate proceedings, taken together, Petitioner was not "afforded a fundamentally fair trial." *Morris v. Sec'y, Dep't of Corrs.*, 677 F.3d 1117, 1132 (11th Cir. 2012). *See also Sims v. Singletary*, 155 F.3d 1297, 1314 (11th Cir. 1998) (addressing a cumulative-error claim in a federal habeas petition); *State v. Lane*, 308 Ga. 10, 13 (2020) (citing *Strickland*, 466 U.S. at 687).

(Doc. no. 14, pp. 33-34.) In essence, Ground F alleges that, had Mr. Winchester raised on appeal all the individual claims of ineffectiveness by Mr. Bravo asserted in the federal petition, there is a reasonable probability the Georgia Supreme Court would have reversed and remanded for a new trial on cumulative error grounds.

Ground F does not assert that Mr. Winchester was ineffective for failing to raise on appeal a specific claim of cumulative error, but this does not preclude consideration of Ground F. This is because, since 2007, the Georgia Supreme Court has automatically considered cumulative error whenever there are multiple allegations of trial counsel ineffectiveness, regardless of whether the appellant raises a cumulative error argument. See Schofield v. Holsey, 642 S.E.2d 56, 60 n.1 (Ga. 2007), *overruled on other grounds by* State v. Lane, 838 S.E.2d 808 (Ga. 2020). As Schofield explains, "it is the prejudice arising from 'counsel's errors' that is constitutionally relevant, not that each individual error by counsel should be considered in a vacuum." 642 S.E.2d at 60 n.1 (quoting Strickland, 466 U.S. at 687).[2] Neither

---

[2] See also Jackson v. State, 829 S.E.2d 142, 159 (Ga. 2019) ("Although we have evaluated each claim separately, we also recognize that "the effect of prejudice resulting from counsel's deficient performance is viewed cumulatively. To that end, we conclude that the cumulative prejudice from any deficiencies assumed in Divisions 4 through 7 is insufficient to create a reasonable probability that the

the Supreme Court nor the Eleventh Circuit has determined whether cumulative error is cognizable in the § 2254 context.[3]   The issue is irrelevant because Petitioner alleges Mr. Winchester was deficient by failing to provide the Georgia Supreme Court with an opportunity to conduct its cumulative error analysis as a result of his failure to appeal the alibi and handedness issues.

Because the state habeas court found no deficiencies in Mr. Winchester's performance, it did not engage in cumulative error analysis.  (See doc. no. 1-6.)  Respondent argues this is entirely reasonable because there is no cumulation to consider if there are no errors in the first instance.  (Doc. no. 16, pp. 7-8) see Lane, 838 S.E.2d at 812 ("To date, we have considered the cumulative effect of certain types of errors, in particular counsel's errors that amount to deficient performance — because ineffective assistance of counsel is a federal constitutional claim, and the United States Supreme Court has told us that we must.").  Because the Court has already found irrefutably deficient performance by Messrs. Bravo and Winchester concerning both the alibi and handedness defenses, the sole remaining question is whether those errors in combination were prejudicial on appeal.  Ground F fails because the Court

---

results of the proceedings would have been different in the absence of the deficiencies alleged."); Jones v. State, 827 S.E.2d 879, 886–87 (Ga. 2019) (evaluating cumulative error of multiple deficiencies for same reason); Bentley v. State, 834 S.E.2d 549, 557–58 (Ga. 2019) (same); Powell v. State, 834 S.E.2d 822, 829–30 (Ga. 2019) (same); Smith v. State, 834 S.E.2d 1, 11 (Ga. 2019) (same); Franklin v. State, 831 S.E.2d 186, 199 (Ga. Ct. App. 2019) (same).

[3] See Tarleton v. Sec'y, Fla. Dep't of Corr., 5 F.4th 1278, 1292 (11th Cir. 2021) (per curiam) ("[W]e need not reach the issue of whether cumulative error is cognizable in habeas proceedings."); Hill v. Sec'y, Fla. Dep't of Corr., 578 F. App'x 805, 810 (11th Cir. 2014) (per curiam) ("[W]e need not decide the issue here because, even assuming a claim of cumulative error is cognizable in federal habeas proceedings, [petitioner] would not be able to satisfy that standard.").  Nor has the Supreme Court.  See Forrest v. Florida Dep't of Corr., 342 F. App'x 560, 564 (11th Cir. 2009) (per curiam) ("The Supreme Court has not directly addressed the applicability of the cumulative error doctrine in the context of an ineffective assistance of counsel claim.").

cannot say that every fairminded jurist would agree there was a reasonable probability of reversal on appeal had Mr. Winchester provided the Georgia Supreme with the ability to conduct its cumulative error analysis by raising the alibi and handedness issues on appeal.

Were this the direct appeal or state habeas proceeding, the Court would find prejudice on appeal because (1) the murder conviction was secured with weak evidence of guilt consisting of a single eyewitness identification and a cryptic cell phone connection; (2) trial counsel failed to present not only an alibi defense but also evidence that the defendant cannot shoot a gun with the hand that the sole eyewitness testified the shooter used; and (3) appellate counsel failed to point out both of these errors on appeal, opting instead for weaker arguments quickly brushed aside by the Georgia Supreme Court.

At the same time, however, the Court cannot go so far as to say that the state habeas court's determination of no prejudice from these cumulative errors was unreasonable. While there is no physical evidence tying Petitioner to the murder scene or any evidence of motive, Miss Howard's two identifications of Petitioner as the shooter, in the lineup and at trial, were unequivocal and supported by the documented connection between Petitioner's phone, Mr. Johnson's phone, and Mr. Wright's phone in the hour leading up to Mr. Wright's murder. And while the jury did not hear evidence that Petitioner is uncoordinated with his left hand, the record is clear that they observed him using only his right hand to take notes during the dayslong trial.

Furthermore, the only evidence supporting the alibi defense and Petitioner's limited ability to use his left hand is the uncorroborated testimony of Ms. Brown, who as his girlfriend had a vested interest in his acquittal and was vague on important details such as the color of her Ford Focus and whether it was repossessed before the murder. (Doc. no. 1-6, pp. 8-9.)

57

"By contrast," Miss Howard had a clear vantage point from mere feet away, she identified Petitioner as the shooter in a lineup after declining to identify anyone in prior lineups, and investigators "linked Petitioner to the victim through cell-phone records which provided the basis for the inclusion in the photographic line-up." (Id. at 9 n.5.)  For these reasons, the state habeas court's determination of no prejudice was a reasonable application of Strickland, and fairminded jurists could disagree on the correctness of its determination.

### E.    All Remaining Grounds Also Fail

#### 1.    Ground B Fails Because the Trial Court Did Not Err in Excluding the Alibi Witnesses Due to Mr. Bravo's Failure to Timely Submit a Witness List

Petitioner asserts Mr. Winchester should have argued on appeal the trial court erred by excluding the alibi witnesses because Mr. Hadden complied with the alibi notice statute, O.C.G.A. § 17-16-5, and the trial court made no findings of bad faith and prejudice as required for exclusion under O.C.G.A. § 17-16-6.  (Doc. no. 14, pp. 25-27.)  The Court disagrees.

Petitioner must rebut with "clear and convincing evidence" the presumption of correctness that applies to a trial court's factual findings.  See Whatley v. Warden, Ga. Diagnostic & Classific. Ctr., 927 F.3d 1150, 1175 (11th Cir. 2019).  Moreover, this Court should "defer to the state's construction of its own law" when federal ineffective assistance claims are based on counsel's failure to raise issues of state law.  Pinkney v. Sec'y, DOC, 876 F.3d 1290, 1295 (11th Cir. 2017); see also Agan v. Vaughn, 119 F.3d 1538, 1549 (11th Cir. 1997) ("[S]tate courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters.").  Therefore, when considering "whether there is any reasonable argument counsel satisfied Strickland's deferential standard," Pinkney, 876 F.3d at 1295, the Court presumes the state habeas court knows, and correctly applied, Georgia law.

Petitioner has the burden of proof on his claims and the burden to complete the habeas record with the state record. Holt v. Ebinger, 814 S.E.2d 298, 301 (Ga. 2018).

Here, the trial court excluded the alibi witnesses because the defense failed to submit any pretrial witness list, which caused at least one alibi witness to attend the trial in violation of the rule of sequestration and gave no time for the State to investigate the alibi defense. The state habeas court found exclusion was not an abuse of discretion "[g]iven the circumstances and the prejudice to the State," explaining O.C.G.A. § 17-16-8 requires attorneys to provide reciprocal witness lists in advance of trial and the State would be prejudiced if late-disclosed witnesses were allowed. (Doc. no. 1-6, pp. 10-11.)

Indeed, O.C.G.A. § 17-16-6 provides "[i]f at any time during the course of the proceedings it is brought to the attention of the court that the defendant has failed to comply with the requirements of this article, the court may . . . upon a showing of prejudice and bad faith, prohibit the defendant from . . . presenting the witness not disclosed." O.C.G.A. § 17-16-6; see also Thompson v. State, 517 S.E.2d 339 (Ga. Ct. App. 1999) (finding no abuse of discretion when trial court excluded defense witness after defense failed to provide information required under O.C.G.A. § 17-16-8(a) and nondisclosure was prejudicial to the State).

Petitioner argues Mr. Winchester should have appealed the issue because the trial court failed to make the requisite findings of bad faith and prejudice. (Doc. no. 14, p. 27.) However, the trial court explained it was the second day of trial, Mr. Bravo failed to provide a witness list in advance of trial, and the State had no opportunity to investigate the alibi defense. (Tr. 200.) The trial court described the problem as "a major discovery issue where the State would have an opportunity to be prepared, to investigate those witnesses, to investigate everything behind it, [and] to go out and interview [the witnesses]." (Tr. 200.) Inherent in these remarks

are the conclusions (1) defense counsel acted in bad faith by failing to submit a witness list and surprising the State on the second day of trial; and (2) the State would be prejudiced if the court permitted the alibi witnesses to testify.

For these reasons, the state habeas court did not incorrectly apply Georgia law and thus did not unreasonably apply Strickland in concluding Mr. Winchester was not ineffective for failing to raise this ground because Petitioner has not established it would have been meritorious on appeal.

**2.  Ground C Fails Because the Trial Court Did Not Err in Overruling Objections to Investigator Beckman's Testimony Concerning Information Conveyed by Other Investigating Officers**

Petitioner asserts Mr. Winchester should have argued on appeal the trial court erred by overruling objections to Investigator Beckman's testimony that Mr. Daiquan Johnson told another investigator (1) he was attending the fair at the time of the murder; and (2) his phone was stolen prior to it receiving a call from a cell phone belonging to Petitioner.  (Doc. no. 14, pp. 28-30.)  Mr. Bravo objected on best evidence and hearsay grounds.  (Tr. 212-13.)  The trial court concluded the testimony was admissible "not [for] the accuracy, but [Investigator Beckman] can report what the communication was to him" and testify to his reaction to the communication.  (Tr. 213.)  While the state habeas court did not specifically address this issue, it generally concluded Mr. Winchester did not render "ineffective assistance in his selection of issues to pursue on appeal" and Petitioner suffered no prejudice.  (Doc. no. 1-6, p. 11.)  These conclusions are not unreasonable.

Mr. Winchester testified he did not appeal the hearsay issue because the standard of review was harmless error, and as a matter of strategy he avoided arguing any issue on appeal subject to this deferential standard of review.  (Tr. 39.)  This decision does not constitute

ineffective assistance because appellate counsel's role is to weed out weaker arguments in selecting issues for review, even if such arguments have merit.  Jones, 463 U.S. at 751-52; Philmore, 575 F.3d at 1264.  Indeed, Mr. Winchester was correct that Georgia appellate courts review hearsay errors under the harmless error standard.  See Kingdom v. State, 914 S.E.2d 778, 783 (Ga. 2025) ("[A]ny error in admitting that testimony was harmless under the nonconstitutional harmless error standard." (citing Kitchens v. State, 854 S.E.2d 518, 522 (Ga. 2021) (applying the harmless error standard)); Talley v. State, 875 S.E.2d 789, 796 (Ga. 2022) (conducting harmless error review of admission of statement under the residual hearsay exception).

For the same reasons, Petitioner does not establish prejudice because the harmless-error standard is inherently forgiving, and thus issues raised on appeal in which this standard of review applies are in general unlikely to prevail.  See Pounds v. State, 908 S.E.2d 631, 637 (Ga. 2024) ("Under the nonconstitutional harmless-error standard, [the Georgia Supreme Court] examine[s] 'whether it is highly probable that the error did not contribute to the verdict' by 'review[ing] the record de novo and weigh[ing] the evidence as we would expect reasonable jurors to have done so.'" (quoting Jackson v. State, 829 S.E.2d 142, 153 (Ga. 2019))). Moreover, Investigator Beckman's testimony was not admitted for the truth of the matter asserted, as the trial court limited its admission for purposes of showing what was communicated to him and how he subsequently acted upon this information.  (Tr. 212-13). Accordingly, because the testimony was not admitted for hearsay purposes, Petitioner could not have suffered any prejudice by its admission because this argument would not have been successful on appeal.  To the extent there was any merit to this hearsay objection, it was reasonable for Mr. Winchester to winnow this argument in his selection of issues for appeal

61

considering the highly deferential harmless error standard.

Therefore, because there was not a reasonable probability of success on appeal, Petitioner did not suffer any prejudice from Mr. Winchester's failure to raise this argument. As such, Mr. Winchester was not ineffective for failing to raise this argument. For these reasons, the state habeas court did not unreasonably apply Strickland in determining Mr. Winchester did not render deficient performance and there was no prejudice.

### 3.   Ground D Fails Because It Is Procedurally Defaulted

Petitioner argues Mr. Winchester should have challenged the trial court's exclusion on hearsay grounds of Miss Howard's testimony concerning an anonymous call because the caller's alleged statements to Miss Howard were admissible for impeachment. (Doc. no. 14, p. 31.) Respondent argues this ground is procedurally defaulted because Petitioner never raised it in his state habeas petition and, instead, raised Mr. Winchester's failure to appeal the trial court's exclusion of testimony concerning a phone call with another person. (Doc. no. 10, p. 3 n.2.) Respondent is correct. In the state habeas post-hearing brief, Petitioner argued Mr. Winchester should have appealed the exclusion of impeachment evidence regarding a phone call made by Miss Howard to Petitioner's uncle. (Doc. no. 11-5, pp. 13-14.) In contrast, the current ground concerns an anonymous call received *by* Miss Howard from an anonymous caller. (Doc. no. 14, pp. 30-31.) Because this ground was not asserted in the state proceeding, it is procedurally defaulted.

### a.   A Federal Habeas Petitioner Defaults a Claim by Failing to Properly Exhaust State Remedies

AEDPA preserves the traditional exhaustion requirement, which requires a district court to dismiss unexhausted habeas claims the petitioner did not raise in state court, but could

have raised by any available procedure.  28 U.S.C. § 2254(b)(1)(A) & (c).  A state inmate is deemed to have exhausted his state judicial remedies when he has given the state courts, or they have otherwise had, a fair opportunity to address the federal claims.  Castille v. Peoples, 489 U.S. 346, 351 (1989).  "In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."  O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999).

Moreover, giving the state courts an opportunity to act on a petitioner's claims includes allowing the state courts to complete the appellate review process.  As the Supreme Court explained:

> Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts, we conclude that state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process. Id. at 845.

This "one full opportunity" includes pursuing discretionary review with the highest available appellate court..  Id.  "Georgia's appeal process requires that a petitioner seek a certificate of probable cause to appeal to the Georgia Supreme Court; claims not raised in an application for a certificate of probable cause are considered unexhausted on subsequent federal habeas review.  Sealey v. Warden, Ga. Diagnostic Prison, 954 F.3d 1338, 1364 (11th Cir. 2020) (citations omitted); see also Pope v. Rich, 358 F.3d 852, 853 (11th Cir. 2004) (per curiam) (ruling a petitioner's "failure to apply for a certificate of probable cause to appeal the denial of his state habeas petition to the Georgia Supreme Court means that [the petitioner] has failed to exhaust all of his available state remedies").

"A state prisoner seeking federal habeas relief cannot raise a federal constitutional claim in federal court unless he first properly raised the issue in the state courts."  Henderson

v. Campbell, 353 F.3d 880, 891 (11th Cir. 2003) (quoting Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001)).  The exhaustion requirement applies with equal force to all constitutional claims.  See Lucas v. Sec'y, Dep't of Corr., 682 F.3d 1342, 1351-54 (11th Cir. 2012); Footman v. Singletary, 978 F.2d 1207, 1211 (11th Cir. 1992).  "Ultimately, 'to exhaust state remedies fully[,] the petitioner must make the state court aware that the claims asserted present federal constitutional issues.'"  Preston v. Sec'y, Fla. Dep't of Corr., 785 F.3d 449, 457 (11th Cir. 2015) (citation omitted).  Furthermore, a petitioner's failure to exhaust his claims properly ripens into a procedural default once state remedies are no longer available.  McNair v. Campbell, 416 F.3d 1291, 1305 (11th Cir. 2005).

A federal habeas petitioner can run afoul of procedural default rules in one of two ways, depending on whether the claim is an old one the petitioner already attempted to assert unsuccessfully in state court, or a new one the petitioner never attempted to raise in state court. First, a federal habeas petitioner cannot revive an old claim that a state court previously denied on independent and adequate procedural grounds.  "As a general rule, a federal habeas court may not review state court decisions on federal claims that rest on state law grounds, including procedural default grounds, that are 'independent and adequate' to support the judgment." Boyd v. Comm'r, Ala. Dep't of Corr., 697 F.3d 1320, 1335 (11th Cir. 2012).

A state court decision rests on "independent and adequate" state procedural grounds when it satisfies the following three-part test:

> First, the last state court rendering a judgment in the case must clearly and expressly say that it is relying on state procedural rules to resolve the federal claim without reaching the merits of the claim.  Second, the state court decision must rest solidly on state law grounds, and may not be intertwined with an interpretation of federal law.  Finally, the state procedural rule must be adequate; *i.e.,* it may not be applied in an arbitrary or unprecedented fashion.  The state court's procedural rule cannot be "manifestly unfair" in its treatment of the

> petitioner's federal constitutional claim to be considered adequate for purposes of the procedural default doctrine. In other words, a state procedural rule cannot bar federal habeas review of a claim unless the rule is "firmly established and regularly followed."

Id. at 1336 (internal quotations and citations omitted). Additionally, the Supreme Court has made clear that "a state procedural bar may count as an adequate and independent ground for denying a federal habeas petition even if the state court had discretion to reach the merits despite the default." Walker v. Martin, 562 U.S. 307, 311 (2011).

Second, a federal habeas petitioner runs afoul of procedural default rules when he attempts to bring a new claim in his federal petition that would be procedurally barred if he attempted to raise it in state court. In such instances, unless the petitioner either establishes the cause and prejudice or the fundamental miscarriage of justice exception, the failure to bring the claim properly in state court has "matured into a procedural default." Smith v. Jones, 256 F.3d 1135, 1138-39 (11th Cir. 2001). Thus, where a state procedural bar is apparent, a court "can forego the needless 'judicial ping-pong' and just treat those claims now barred by state law as no basis for federal habeas relief." Smith v. Sec'y, Dep't of Corr., 572 F.3d 1327, 1342 (11th Cir. 2009) (citing Snowden v. Singletary, 135 F.3d 732, 736 (11th Cir. 1998)); Bailey v. Nagle, 172 F.3d 1299, 1303 (11th Cir. 1999). To determine whether a claim is procedurally barred in this way, the federal court must ask whether "it is clear from state law that any future attempts at exhaustion would be futile." See Bailey, 172 F.3d at 1305.

Simply put, if a claim has not been "fairly presented to the state courts, it is procedurally defaulted." Jones v. Campbell, 436 F.3d 1285, 1304 (11th Cir. 2006). To that end, absent a showing of either cause to excuse the default and actual prejudice or a fundamental miscarriage of justice, O.C.G.A. § 9-14-48(d) precludes state habeas review of any issue not preserved for

collateral attack in a state court by timely objecting and raising the issue on appeal.  See Devier, 3 F.3d at 1454-55 (citing O.C.G.A. § 9-14-48(d) and upholding a finding of procedural default on numerous claims); see also Waldrip v. Head, 620 S.E.2d 829, 835 (Ga. 2005) ("Claims not raised on direct appeal are barred by procedural default, and in order to surmount the bar to a defaulted claim, one must meet the 'cause and prejudice' test."); Black v. Hardin, 336 S.E.2d 754, 755 (Ga. 1985) ("The rule now may be stated as follows:  a failure to make timely objection to *any* alleged error or deficiency or to pursue the same on appeal ordinarily will preclude review by writ of habeas corpus.").  In addition, Georgia law prohibits the assertion of state habeas claims in any successive petition that could have been asserted in the original state habeas petition.  O.C.G.A. § 9-14-51; Chambers v. Thompson, 150 F.3d 1324, 1327 (11th Cir. 1998) ("The Georgia statute restricting state habeas review of claims not presented in earlier state habeas petitions can and should be enforced in federal habeas proceedings against claims never presented in state court . . . .").

### b.  Ground D Is Procedurally Defaulted

Petitioner did not raise the argument in Ground D concerning anonymous phone calls received by Miss Howard, (doc. no. 14, pp. 30-31), in either his state habeas petition or post-hearing brief, (doc. no. 11-4; doc. no. 11-5, pp. 13-14).  "[H]abeas petitioners may not present particular factual instances of ineffective assistance of counsel in their federal petition that were not first presented to the state courts."  Kelley v. Sec'y for Dep't of Corr., 377 F.3d 1317, 1344 (11th Cir. 2004) (citing Footman, 978 F.2d at 1211).  Accordingly, because subsection (D) is new and could have been presented in the state courts, this claim is now procedurally defaulted.  See O.C.G.A. § 9-14-51; Chambers, 150 F.3d at 1327.

####    c.    Petitioner Cannot Satisfy the Cause and Prejudice Standard to Justify Federal Review of His Defaulted Claim and the Miscarriage of Justice Exception Does Not Apply

"A petitioner may obtain federal review of a procedurally defaulted claim if he can show both cause for the default and actual prejudice resulting from the default." Jones, 436 F.3d at 1304 (citing Wainwright v. Sykes, 433 U.S. 72, 97 (1977)). "Cause for a procedural default exists where something *external* to the petitioner, something that cannot fairly be attributed to him[,] . . . impeded [his] efforts to comply with the State's procedural rule." Maples v. Thomas, 565 U.S. 266, 280 (2012) (internal quotation marks omitted). "Once cause is proved, a petitioner also must prove prejudice. He must show 'not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001) (quoting United States v. Frady, 456 U.S. 152, 170 (1982)). For example, procedural default does not preclude federal habeas review when

> (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law *requires* that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

Trevino v. Thaler, 569 U.S. 413, 423 (2013); Martinez v. Ryan, 566 U.S. 1, 13-14, 16-17 (2012).

Petitioner has presented no valid justification for failing to raise his defaulted claim in his state habeas proceedings, let alone something external that cannot be fairly attributed to him. Although ineffective assistance of counsel may demonstrate cause, Nyhuis, 211 F.3d at 1344, Petitioner does not show how his defaulted claim is substantial, nor how Mr. Winchester

67

was ineffective for failing to raise a meritless claim.  Moreover, Petitioner does not allege his state habeas counsel, Mr. Wallack, was ineffective for failing to raise this claim in his state habeas petition.  Accordingly, Petitioner has failed to demonstrate the necessary cause and prejudice to overcome procedural default of Ground D.

"[I]n extraordinary cases, a federal court may grant a habeas petition without a showing of cause and prejudice to correct a fundamental miscarriage of justice."  Jones, 436 F.3d at 1304 (citing Murray v. Carrier, 477 U.S. 478, 496 (1986)).  The narrow fundamental miscarriage of justice exception encompasses the extraordinary instance in which a constitutional violation probably has resulted in the conviction of one actually innocent of the crime.  Murray, 477 U.S. at 496; see also Johnson, 256 F.3d at 1171 ("This exception is exceedingly narrow in scope, as it concerns a petitioner's 'actual' innocence rather than his 'legal' innocence.").

In McQuiggin v. Perkins, the Supreme Court held that this exception survived AEDPA's passage but "applies to a severely confined category:  cases in which new evidence shows it is more likely than not that no reasonable juror would have convicted [the petitioner]."  569 U.S. 383, 395 (2013) (quoting Schlup v. Delo, 513 U.S. 298, 329 (1995)).  Petitioner has presented no new evidence regarding his defaulted claim.  Additionally, the Court has found in the opening sections of this Report and Recommendation that Petitioner did not receive a fair trial or appeal due to egregious errors by trial and appellate counsel.  At the same time, however, the Court cannot go so far as to say that no reasonable juror would have convicted him in the first trial or even a second trial wherein competent defense counsel presented evidence concerning Petitioner's handedness and his alibi defense.  Accordingly, Ground D has been defaulted and provides no basis for federal habeas relief.

68

## IV.    CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** the § 2254 amended petition be **DENIED**, this civil action be **CLOSED**, and a final judgment be **ENTERED** in favor of Respondent.

SO REPORTED AND RECOMMENDED this 13th day of July, 2026, at Augusta, Georgia.

BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA